Honorable Ronald V. DELLUMS et al.

v.

James M. POWELL, Chief, United States Capitol Police, Appellant,

Jerry V. Wilson, Chief, Metropolitan Police Department, et al.

No. 75-1974.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 14, 1977.

Decided Aug. 4, 1977.

Rehearing Denied Nov. 14, 1977.

See also, 184 U.S.App.D.C. ——, 566 F.2d 216, and 184 U.S.App.D.C. ——, 566 F.2d 231.

Dennis G. Linder, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., and Robert E. Kopp and David J. Anderson, Attys., Dept. of Justice, Washington, D. C., were on the briefs, for appellant.

Warren K. Kaplan, Washington, D. C., with whom Lawrence H. Mirel, Ralph J. Temple, Mary A. McReynolds, and Kenneth V. Handal, Washington, D. C., were on the brief, for appellees.

Before WRIGHT, TAMM and LEVEN-THAL, Circuit Judges.

Opinion for the court filed by J. SKELLY WRIGHT, Circuit Judge.

Concurring opinion filed by LEVEN-THAL, Circuit Judge.

Dissenting opinion filed by TAMM, Circuit Judge.

J. SKELLY WRIGHT, Circuit Judge:

On November 11, 1971 this suit was brought in the United States District Court by Congressman Dellums individually and by nine persons seeking to represent a class of all persons arrested on the steps of the United States Capitol on May 5, 1971 while engaged in a protest against the war in Vietnam. Persons named as defendants included various officials of the United States and of the District of Columbia and the District itself.[1] Suit was predicated on an allegation that the defendant officials had engaged in a civil conspiracy to arrest and detain the class members with the purpose of frustrating their First Amendment right to protest against the war. Liability was asserted under the "First, Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution of the United States; the Civil Rights Act, 42 U.S.C. §§ 1981, et seq.; and the law of the District of Columbia," and damages were alleged to be in excess of $10,000 for each plaintiff and class member.[2]

The complaint stated that the class plaintiffs had met with some 2,000 persons on the Mall near the United States Capitol on the early afternoon of May 5, 1971. At that meeting plans were made to protest against the war in Vietnam by staging a public meeting at the Capitol, with Congressman Dellums and other Members of Congress to be in attendance and to address the assembled protestors. Pursuant to an agreement with police officials, those assembled on the Mall walked three abreast in groups of 21 from their meeting place on the Mall to the Capitol Grounds, obeying traffic signals and the directions of police officers along the way. At the Capitol the leaders were stopped by an officer of the Capitol Police, but were allowed to enter the Grounds when Congressman Dellums appeared and explained the arrangements for a meeting on the Capitol steps.

The group subsequently assembled on the East steps of the Capitol on the House side and "began to make and to listen to speeches concerning the People's Peace Treaty and related matters."[3] While Con-

1. As filed, the complaint named the following defendants: James M. Powell, Chief of the United States Capitol Police; Jerry V. Wilson, Chief of the District of Columbia Metropolitan Police Department; Kenneth L. Hardy, Director of the District of Columbia Department of Corrections; the District of Columbia; John N. Mitchell, Attorney General of the United States; Richard Kleindienst, Deputy Attorney General of the United States; Will Wilson, Assistant Attorney General of the United States in charge of the Criminal Division. Claims against Kenneth Hardy and Will Wilson were dismissed during pretrial. The claim against John Mitchell was severed when former Presi-

dent Nixon interposed a claim of privilege against certain discovery aimed at elucidating Mitchell's involvement in the events challenged in this suit. See generally Dellums v. Powell, 182 U.S.App.D.C. 244, 561 F.2d 242 (1977), modified by order of April 27, 1977.

2. Complaint ¶ 2, JA 29. The complaint also prayed for declaratory relief and expungement of arrest records. These claims were mooted by the relief granted in Sullivan v. Murphy, 380 F.Supp. 867 (D.D.C.1974).

3. Complaint ¶ 18, JA 33.

gresswoman Abzug was addressing the crowd, at about 3:30 P.M., the police cordoned off the bottom of the steps, preventing anyone from leaving, and began arresting members of the assemblage. Arrests continued over the protests of Congressman Dellums and other Members of Congress, and the police refused Dellums' offer to persuade the crowd to disperse.

The complaint further alleged that those arrested were held for periods of from several hours to several days without being afforded due process of law. In addition, conditions of detention were said to have been inhumane in that there was severe overcrowding, inadequate sanitation, inadequate or filthy bedding, insufficient food, and no medical care. Access to attorneys and telephones was said to have been denied or severely restricted.

In answer the defendants generally denied that the demonstration at the Capitol had been peaceful and in accord with applicable law. They asserted probable cause for the arrests made at the Capitol and official immunity from prosecution. The District of Columbia raised its municipal immunity as a defense and further claimed that the individual defendants were at all times the servants of the United States. All defendants denied that conditions of detention had been inhumane.

After a period of pretrial motion practice and discovery, the trial court certified this suit as a class action in May 1973 and defined the class as "all persons who were arrested while assembled on the Capitol steps on May 5, 1971." [4] This action came on for trial before a jury in December 1974. The evidence adduced at trial, as shall appear more fully below, was in conflict and provided support for the contentions in both the complaint and the answer. At the close of plaintiffs' case and again at the close of all the evidence, the defendants remaining in the case [5] —Deputy Attorney General Kleindienst, United States Capitol Police Chief James M. Powell, District of Columbia Police Chief Jerry V. Wilson, and the District of Columbia—each moved for a directed verdict. Deputy Attorney General Kleindienst's motion was granted; all others were denied. The case was submitted to the jury and substantial verdicts were returned, as indicated in the margin. [6]

Chiefs Powell and Wilson and the District of Columbia each prosecuted appeals from the judgment entered below on the jury verdicts. The plaintiffs below have also appealed the directed verdict in favor of Deputy Attorney General Kleindienst. Finally, Chief Powell and the District have appealed from an order reinstating to this action three named plaintiffs who were dismissed before trial for failing to comply with discovery requests. These appeals were consolidated for argument; however, we have found it convenient to write separately in each. Accordingly, we will take up Chief Powell's appeal from the judgment below in this opinion; the points

4. Order of May 25, 1973, JA 85. The court also ordered defendants to provide "whatever information they have on the identity of class members," *id.*, so that notice could be afforded the class. *See* Rule 23(c), Fed.R.Civ.P. Defendants were ordered to pay the cost of notice, a practice which has since been ruled inappropriate by the Supreme Court, *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), but which constitutes harmless error in the context of this suit.

5. *See* note 1 *supra*.

6. The damages awarded by the jury are as follows:
 A. *For False Arrest and False Imprisonment*:
 (1) for 12 hours or less of detention, $120;
 (2) for 12 to 24 hours of detention, $360;
 (3) for 24 to 48 hours of detention, $960;
 (4) for 48 to 72 hours of detention, $1,800.
 B. *For Violation of First Amendment Rights*:
 $7,500 for each class member and $7,500 for Congressman Dellums.
 C. *For Cruel and Unusual Punishment*:
 $500 for each member of the plaintiff class.
 D. *For Malicious Prosecution*:
 (1) $3,000 for each of eight persons who were defendants in a 1971 criminal trial;
 (2) $50 for all other class members.
The judgment for cruel and unusual punishment was rendered against the District of Columbia alone. All other awards run jointly and severally against defendants Powell, Wilson, and the District of Columbia. For a summary of the results of this appeal, *see* note 89 *infra*.

raised by Chief Wilson and the District of Columbia will be the subject of an opinion in No. 75–1975; the plaintiffs' appeal is treated by order in No. 75–2117; and objections to the reinstatement of certain named plaintiffs will be discussed in an opinion in Nos. 76–1418 & 76–1419.

Chief Powell was held liable to the class plaintiffs for common law false arrest, false imprisonment, and malicious prosecution and for a Bivens[7] claim based on violations of the First and Fourth Amendments. In addition, he was held liable to Congressman Dellums on a Bivens claim based on the First Amendment. We begin by discussing a cluster of issues surrounding the false arrest-false imprisonment-Fourth Amendment claim (which shall hereafter be referred to simply as false arrest), and then consider points raised concerning liability for malicious prosecution of the class and First Amendment liability to both the class and Congressman Dellums.

## I. FALSE ARREST, FALSE IMPRISONMENT, FOURTH AMENDMENT VIOLATION

■ The tort action of false arrest in both its common law and constitutional variants protects and vindicates the interest in freedom from unwarranted interference with personal liberty. The focal point of the action is the question whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails. While the central issue of the action is simply stated, the parties have somewhat divergent views on the mechanics of pleading, the allocation of the burden of proof, and the scope and elements of defenses available in a false arrest action. For this reason, and to aid later analysis, we now sketch the salient features of both the common law and constitutional action.

■ A plaintiff suing at common law must show that he has suffered an imprisonment and that the imprisonment was un-

lawful. The former issue is one of fact, potentially for the jury. Under the law of the District of Columbia, the unlawfulness of a detention is presumed once "an allegation [is made] that a plaintiff was arrested and imprisoned without process." Clarke v. District of Columbia, 311 A.2d 508, 511 (D.C.App.1973). The burden then shifts to the defendant to justify the arrest. Id.; accord, e.g., Pierson v. Ray, 386 U.S. 547, 556–557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Director General of Railroads v. Kastenbaum, 263 U.S. 25, 27, 44 S.Ct. 52, 68 L.Ed. 146 (1923); see, e.g., Restatement (Second) of Torts §§ 10 (especially comment c), 121 (1965). Justification can be established by showing that there was probable cause for arrest of the plaintiff on the grounds charged. E.g., Shaw v. May Department Stores Co., 268 A.2d 607, 609 (D.C. App.1970). A lesser showing can also be made, namely that the arresting officer had reasonable grounds to believe a crime had been committed and that plaintiff's arrest was made for the purpose of securing the administration of the law (i.e., that the officer acted in good faith). See Wade v. District of Columbia, 310 A.2d 857, 862–863 (D.C.App.1973) (en banc), citing Pierson v. Ray, supra; Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 456 F.2d 1339, 1347–1348 (2d Cir. 1972); Hill v. Rowland, 474 F.2d 1374, 1377 (4th Cir. 1973). See also Restatement, supra, §§ 121, 127.

■ The mechanics of pleading and proof in a Bivens action for false arrest are in our judgment identical to those sketched above. Although we know of no case delineating the parameters of a prima facie case under a Bivens false arrest theory, Pierson v. Ray, supra, indicates that the details of constitutional tort actions should be shaped by reference to the parallel common law. See 386 U.S. at 556–557, 87 S.Ct. 1213. The rule recognized in the District that an allegation of arrest and imprisonment without warrant shifts to the defendant the burden

7. Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

of justifying the arrest is the majority rule in this country[8] and we see no identifiable purpose that would be served by adopting a different or more stringent definition of a *prima facie* case in constitutional litigation.[9] On a different point, there can be no doubt that state and federal police officers sued under Section 1983 and *Bivens*, respectively, have available to them a qualified immunity defense, a privilege based on good faith and reasonableness, *but* that the burden is on the defendant officers to prove it.[10] *See Pierson v. Ray, supra,* 386 U.S. at 555–557, 87 S.Ct. 1213; *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, supra,* 456 F.2d at 1347–1348; *Hill v. Rowland, supra,* 474 F.2d at 1377–1378; *Jones v. Perrigan,* 459 F.2d 81, 83 (6th Cir. 1972); *Shifrin v. Wilson,* 412 F.Supp. 1282, 1294–1295 (D.D.C.1976); *cf. Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *McSurely v. McClellan,* 553 F.2d 1277, 1291 n.50 (1976) (*en banc*); *Zweibon v. Mitchell,* 170 U.S. App.D.C. 1, 77–78, 516 F.2d 594, 670–671 (1975) (*en banc*), cert denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976); *Apton v. Wilson,* 165 U.S.App.D.C. 22, 29–33, 506 F.2d 83, 90–94 (1974).

■ In the instant case it is undisputed that members of the plaintiff class were arrested without a warrant. Thus the unlawfulness of the plaintiffs' subsequent and admitted imprisonment is presumed as a matter of law and, contrary to the assertion of Chief Powell, plaintiffs were not required to demonstrate that Chief Powell acted without probable cause. For the reasons set out above, the trial judge also correctly determined that the burden of proof was on Chief Powell to show that the May 5 arrests were privileged.

■ Thus the only issue for trial was whether Chief Powell acted in good faith in arresting plaintiffs and whether his actions were reasonable in light of all the circumstances. The Supreme Court has delineated the considerations which must be made in resolving this issue:

> It is the existence of reasonable grounds for the belief [that cause for action existed] formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity. * * *

*Scheuer v. Rhodes, supra,* 416 U.S. at 247–248, 94 S.Ct. 1683–1692. To establish good faith an official must show that he was "acting sincerely and with a belief that he is doing right * * *." *Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). In establishing the reasonableness of an arrest policemen are entitled to show reliance "on traditional sources for the factual information on which they decide and act," *Scheuer v. Rhodes, supra,* 416 U.S. at 246, 94 S.Ct. at 1691, although this proposition must be tempered by an understanding that warrantless arrests for misdemeanors (as here) are authorized by statute only where a violation takes place in the presence of the arresting officer. *See* 23 D.C.Code § 581(a)(1)(B) (1973).[11] Finally, policemen are not "charged with predicting the future course of constitutional law," *Pierson v. Ray, supra,* 386 U.S. at 557, 87 S.Ct. at 1219, but at the same time an arrest may not be "justified by ignorance or disregard of settled, indisputable law * * *."

---

8. *See, e.g., Muller v. Reagh,* 215 Cal.App.2d 831, 30 Cal.Rptr. 633, 637 (1963), and cases cited therein; *Wehrman v. Liberty Petroleum Co.,* 382 S.W.2d 56, 63 (Mo.App.1964), and cases cited therein; *Broughton v. New York,* 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 94–95, 335 N.E.2d 310, 315 *cert. denied, Schanbarger v. Kellogg,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975), and cases cited therein; 32 Am. Jur.2d *False Imprisonment* § 95 at 147 (1967) and cases cited therein; 35 C.J.S. *False Imprisonment* § 55 at 734 (1960) and cases cited therein.

9. Moreover, since plaintiffs can be expected to plead common law false arrest as a pendent claim in constitutional suits, different rules would merely lead to confusion.

10. Of course, a showing of probable cause would also defeat a *Bivens* action for false arrest. *See* U.S.Const. Amend. IV.

11. For this reason we have some difficulty understanding why the dissent places so much emphasis on events that did *not* take place in the presence of Chief Powell.

*Wood v. Strickland, supra,* 420 U.S. at 321, 95 S.Ct. at 1000. Particularizing these standards to the present case, Chief Powell must show that he had an honest belief that the plaintiffs *as a group* were violating the law by assembling at the Capitol and, further, that this belief was reasonable in lignt of the facts available to him at the scene of the arrests and of the law as it then existed.

### A. Directed Verdict

 Notwithstanding the fact that Chief Powell has the burden of persuasion on the issue of qualified official immunity, he argues that a verdict should have been directed in his favor because the evidence overwhelmingly shows that the plaintiffs were in violation of the Capitol Grounds statute, 9 D.C.Code § 124 (1973),[12] at the time of their arrests.[13] Plaintiffs answer this argument by contending that the evidence taken in the light most favorable to them would support a finding that Chief Powell could not reasonably have believed that 9 D.C.Code § 124 as definitively construed in *United States v. Nicholson,* Nos. 20210–69A *et al.* (D.C. Ct. of Gen.Sess. June 19, 1969), *aff'd,* 263 A.2d 56 (D.Č.App.1970) —which all parties agree controls this case [14]—was violated by the activities of

**12.** It is forbidden to parade, stand, or move in processions or assemblages in [the] United States Capitol Grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement, except as hereinafter provided in sections 9–128 and 9–129.

9 D.C.Code § 128 provides:

In order to admit of the due observance within the United States Capitol Grounds of .occasions of national interest becoming the cognizance and entertainment of Congress, the President of the Senate and the Speaker of the House of Representatives, acting concurrently, are hereby authorized to suspend for such proper occasions so much of the prohibitions contained in sections 9–119 to 9–124, as would prevent the use of the roads and walks of the said grounds by processions or assemblages, and the use upon them of suitable decorations, music, addresses, and ceremonies: *Provided* [that arrangements are made for ensuring order and decorum].

9 D.C.Code § 129 provides:

In the absence from Washington of either of the officers designated in section 9–128, the authority therein given to suspend certain prohibitions of sections 9–118, [9–119 to 9–126, 9–127] to 9–132 shall devolve upon the other, and in the absence from Washington of both it shall devolve upon the Capital [*sic*] Police Board * * *.

**13.** Chief Powell also argues that he is entitled to a directed verdict because the plaintiffs are collaterally estopped from relitigating the issue of probable cause for the May 5 arrests. His theory is that eight class members brought to trial on criminal charges twice moved for a directed verdict of acquittal and twice were refused. Since such a motion puts in issue the sufficiency of the evidence adduced by the Government to sustain a conviction, it is argued, the trial judge must have found probable cause for arrest to exist since otherwise a refusal to direct a verdict of acquittal would have been improper.

Chief Powell's theory is clearly incorrect since a motion for directed verdict of acquittal tests the sufficiency of the Government's evidence *at trial* to sustain a conviction, whereas the question raised by a qualified immunity defense is whether the facts available to Chief Powell *at the scene* on May 5, 1971 would support a conclusion that there were reasonable grounds for supposing probable cause for arrest existed. *See Scheuer v. Rhodes,* 416 U.S. 232, 247–248, 94 S.Ct. 1683, 40 L.Ed.2d 134 (1974); *Broughton v. New York, supra* note 8, 37 N.Y.2d at 455–458, 373 N.Y.S.2d at 92–95, 335 N.E.2d at 313–315. Moreover, because the record of the criminal trial was never introduced into evidence, although it was available in the courtroom and the trial judge expressly offered to accept it into evidence, Tr. 4141, JA 2147, it is impossible to determine whether the evidence introduced at trial was in fact material that would have been available to Chief Powell at the scene.

There are a number of other difficulties with this theory, most importantly that Chief Powell took no steps to preserve it below. Rule 8(c), Fed.R.Civ.P., is explicit: "In pleading to a preceding pleading, a party shall set forth affirmatively * * * estoppel * * * [and] res-judicata * * *." Estoppel was never mentioned in either the federal or District of Columbia answers. Nor was estoppel asserted by an amended answer. Nor indeed was evidence introduced (to which the pleadings might be conformed, *see* Rule 15(b), Fed.R.Civ.P.) of the record in the criminal trial. In these circumstances, the defense of collateral estoppel is waived. *See Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc.,* 168 U.S.App.D.C. 149, 161–162, 513 F.2d 407, 419–420 n.92 (1975).

**14.** The dissent would apparently have us apply some other law. *See* dissent at —— n.21 of 184 U.S.App.D.C., at 204 n.21 of 566 F.2d. What the law might be is .a mystery. Were we to decide the issue of the constitutionality of an

May 5. They further urge that, because plaintiffs were charged at the scene of the arrests solely with violating the District of Columbia unlawful entry statute, 22 D.C. Code § 3102 (1973),[15] Chief Powell cannot now defend by showing merely that there were reasonable grounds for believing that 9 D.C.Code § 124 had been violated, but must show that there were reasonable grounds for believing that 22 D.C.Code § 3102 had been violated as well. Before turning to the evidence we must resolve this dispute about the applicable law, because Chief Powell asserts that the facts making out a Section 124 violation are materially different from those making out a Section 3102 violation in that the latter requires an order to disperse and an opportunity to disperse while, in his opinion, the former does not. In our view, Chief Powell's position is incorrect.

### 1. The Law Applicable to Arrests on May 5, 1971

#### (a)

At the outset we note that Chief Powell's argument has a serendipitous quality about it, for the record shows that Chief Powell unquestionably took some steps to order the crowd to disperse on May 5 and, moreover, he testified that standard practice at the Capitol would be for such orders to be given because it was the experience of the Capitol Police that many people were not aware of the statutes governing conduct at the Capitol and would, upon being notified of a potential violation, bring their conduct into line with the law.[16] In addition, regulations issued by Chief Powell[17] required that persons be given individual warnings to leave before they were placed under arrest for participating in a mass demonstration. According to Chief Powell's testimony, however, such individualized orders to leave were not given on May 5.[18] Notwithstanding this administrative interpretation, Chief Powell urges that orders to disperse are not required by Section 124 and, further, that a violation of his own regulations in this regard has no bearing on the falsity of an arrest under that section. For the reasons set forth below, we find that orders to disperse were required, and we therefore reject Chief Powell's contention.

#### (b)

As indicated, all parties agree that the principles announced in *Nicholson* control this case. We have printed Chief Judge Greene's unpublished opinion in *Nicholson* as the Appendix to this opinion and, therefore, will only summarize points which are particularly relevant for present purposes.

In *Nicholson* 13 Quakers were arrested while standing on the steps of the Capitol reading names of Vietnam War dead from the *Congressional Record*. They were charged by information with violating 22 D.C.Code § 3102 in that they failed to leave the Capitol when requested by a Capitol policeman to do so. The Quakers moved to dismiss the information on the ground that 22 D.C.Code § 3102 could not constitutionally be applied to them because their activities were protected by the First Amend-

---

arrest under 9 D.C.Code § 124 *de novo*—in violation of the teaching of *Pierson v. Ray* that policemen are not "charged with predicting the future course of constitutional law," 386 U.S. 547, 557, 87 S.Ct. 1213, 1219 (1967)—we would have to conclude that § 124 was unconstitutional on its face and arrests pursuant to that section unconstitutional *per se*. *See Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F.Supp. 575 (D.D.C.) (three-judge court) (McGowan, J.), *aff'd*, 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972).

**15.** Any person who, without lawful authority, shall enter, or attempt to enter, any public or private dwelling, building or other property * * * against the will of the lawful occu-

pant * * *, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor * * *.

**16.** Tr. 2096, 2099–2100, JA 1286, 1289–1290.

**17.** *See* note 44 *infra*.

**18.** "[N]one of the arresting officers made the statement and gave that last opportunity to leave to the people who were being arrested * * *." Tr. 2105, JA 1295.

ment.[19] Judge Greene agreed, holding that the Capitol was a public forum and consequently that Section 3102 was invalid as applied at the Capitol since it set no standards whatever for its enforcement.[20] Notwithstanding the conclusion that Section 3102 was unconstitutionally vague, Judge Greene considered and accepted in part an argument pressed by the Government—that the indictments against the Quakers could be saved if the Government could show that the Quakers were also violating 9 D.C.Code § 124 at the time they were ordered from the Capitol. It was apparently the Government's theory that 9 D.C.Code § 124 either was not unconstitutionally vague or could be subjected to an appropriate limiting construction.

Reliance on Section 124 created further difficulties, however, since that statute, which bans all use of the Capitol as a public forum except as it is suspended in the discretion of the Speaker of the House and the President of the Senate,[21] was also found to be unconstitutional as written. Worse, Judge Greene found that the suspension power, which the police had interpreted to allow creation of a "permit" system,[22] had been used selectively and that

> there are no written rules; permits likewise are usually not in writing; members of the public have no way of knowing whether they might be in violation of the law or how to avoid violations except by prior experience or by inquiries to Members of Congress or members of the Capitol Police Force.

> \* \* \* \* \* \*

> The conclusion is inescapable that, as the law is administered, it is impossible for anyone to know whether his presence, or the presence of his group, on Capitol Hill is lawful, or unlawful. There is no

set of regulations, orders, rules, or standards which he can consult, and the precedents of administration themselves are contradictory and uncertain.[23]

Notwithstanding these findings and conclusions, Judge Greene held that 9 D.C.Code § 124 could be saved from constitutional infirmity by a limiting construction. The language of the construction adopted is important and we quote it in full:

> It is appropriate, therefore, under the statute *to bar* or *to order from the Capitol Grounds,* any group which is noisy, violent, armed, or disorderly in behavior, any group which has a purpose to interfere with the processes of the Congress, any Member of Congress, congressional employee, visitor, or tourist, any group which has the effect, by its presence, of interfering with the processes of the Congress, any Member of Congress, congressional employee, visitor, or tourist; and any group which damages any part of the building, shrubbery, or plant life.[22]

> [22] In each category, the conduct would have to be more disruptive or more substantial (in degree or number) than that normally engaged in by tourists and others routinely permitted on the Grounds.[24]

Judge Greene then ruled that an indictment charging a violation of 22 D.C.Code § 3102 was constitutionally valid as applied to the Capitol if and only if the Government could show a simultaneous violation of 9 D.C.Code § 124 as limited.

### (c)

We begin our consideration of the application of *Nicholson* to the instant case by noting that Judge Greene's opinion expressly stated that 9 D.C.Code § 124 is unconstitutional except when it is used as a ground

**19.** *United States v. Nicholson,* Nos. 20210–69A *et al.* (D.C.Ct. of Gen.Sess. June 19, 1969), *aff'd,* 263 A.2d 56 (D.C.App.1970), Appendix at [1]–[2].

**20.** *Id.,* Appendix at [3].

**21.** *See* 9 D.C.Code §§ 128–129 (1973), set forth at note 12 *supra.*

**22.** *United States v. Nicholson, supra* note 19, Appendix at [4] n.6. The statutes involved do not themselves authorize any permit system. *See* note 12 *supra.*

**23.** *Id.,* Appendix at [5]–[7].

**24.** *Id.,* Appendix at [17] & n.22 (emphasis added).

"*to bar* or *to order from* the Capitol Grounds" [25] one of the groups enumerated in the opinion. It is apparently Chief Powell's position that such language cannot be taken literally because the *Nicholson* opinion involved informations charging only violations of 22 D.C.Code § 3102, that orders to quit had in fact been given to the *Nicholson* defendants, and that the only issue before Judge Greene was the propriety of those orders. All this is true, but such a crabbed reading of *Nicholson* nonetheless does violence to Judge Greene's analysis since the point of *Nicholson* is that 22 D.C.Code § 3102 is a legal nullity as applied to demonstrations at the Capitol and informations charging a violation of that statute are valid only if the facts show a simultaneous and constitutionally permitted violation of 9 D.C.Code § 124, whether or not 9 D.C.Code § 124 is charged in the information.

■ In addition, the central conclusion of *Nicholson* is that 9 D.C.Code § 124 was unconstitutionally vague as written *and* administered. The vice of such vagueness is twofold.[26] First, a vague statute puts too much discretion in the hands of officials, with the result that the statute may be enforced selectively against those who hold unpopular points of view. Second, a vague statute fails to give those subject to it fair notice of the point at which conduct becomes prohibited. Where some forms of conduct arguably regulated by the statute are protected by the First Amendment, such lack of precision creates an unconstitutional chilling effect.

■ *Nicholson* addresses both vagueness problems, particularly the latter—"it is impossible for anyone to know whether his presence, or the presence of his group, on Capitol Hill is lawful, or unlawful." [27] Were *Nicholson* read as Chief Powell suggests, however, its only effect would be to cabin executive discretion. There would still be no fair warning because, faced with "precedents of administration [which were] themselves contradictory and uncertain," [28] it would be impossible for anyone to tell when his otherwise constitutionally protected behavior (or that of his group) had become "more disruptive or more substantial (in degree or number) than that normally engaged in by tourists and others routinely permitted on the Grounds." [29] Yet only if such a condition obtained would a violation of Section 124 have occurred.[30] Accordingly, the only reading of *Nicholson* that would

25. *Id.*, Appendix at [17] (emphasis added).

26. *See, e. g.*, Note, *The Void-for-Vagueness Doctrine in the Supreme Court*, 109 U.Pa.L. Rev. 67, 67–81 (1960), and cases cited therein.

27. *United States v. Nicholson, supra* note 19, Appendix at [7].

28. *Id.*

29. *Id.*, Appendix at [17] n.22.

30. At a number of points in brief Chief Powell has intimated that his arrests of plaintiffs were justified because he had intelligence information indicating that some demonstrators were coming to the Capitol with "a purpose to interfere with the processes of Congress." *United States v. Nicholson, supra* note 19, Appendix at [17]. Particular emphasis is placed on statements in the May Day Tactical Manual, Federal Exhibit 5, that the purpose of the May 5 demonstration was to "lay a nonviolent siege demanding that congress ratify the Peoples Peace Treaty." Federal Exhibit 5, at 5. Reference is also made to the fact that at least some demonstrators announced their intention to attempt to enter Capitol buildings and disrupt the work of Congress. In our judgment, this information was relevant to the jury's determination of the good faith and reasonableness of Chief Powell's actions, but was not conclusive on this point.

We begin by noting that *Nicholson* does *not* make specific intent to interfere with the purposes of Congress a crime. Footnote 22 of that opinion clearly indicates that there must be conduct in furtherance of such a purpose, and that conduct must be "more disruptive or more substantial (in degree or number) than that normally engaged in by tourists and others and routinely permitted on the Grounds." Appendix at [17] n.22. Far from being an idiosyncratic definition of a crime, the *Nicholson* definition completely accords with the governing construction of the District of Columbia unlawful assembly statute, 22 D.C.Code § 1107 (1973), announced in *Hunter v. District of Columbia*, 47 App.D.C. 406, 409 (D.C.Cir. 1918), which is that unlawful assembly requires *both* an unlawful purpose and an overt act forbidden by the statute. Moreover, there is another section of the Capitol Grounds statute, 9 D.C.Code § 123(b)(4) (1973), which covers precisely the crime of coming to the Capitol "with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress or either House

further Judge Greene's purpose of eliminating an unconstitutional chilling effect is the literal one that an order to quit must precede arrests under 9 D.C.Code § 124.[31]

thereof * * *." The elements of that crime go well beyond specific intent, however, and include willful or knowing utterance of "loud, threatening, or abusive language" or "disorderly or disruptive conduct" "at any place upon the United States Capitol Grounds." The vague proscriptions of § 124 surely do not override the specific provisions of § 123.

In addition, it strains credulity to the breaking point to argue that Chief Powell had an honest belief at the time that the intelligence information before him was enough to make an arrest. The following colloquy is illustrative of this point:

Q [by plaintiffs' attorney] Chief, you had all of this information about some people planning to lay siege to the Capitol before anyone ever reached the steps that afternoon, didn't you?

A [by Chief Powell] Yes, sir.

Q And you knew there were groups coming up from the mall, because you had seen them congregating on the mall, and you heard radio reports as they advanced up Independence Avenue, isn't that so?

A That is correct.

Q And yet you let them come on to the steps, didn't you?

A Yes, sir.

Q You made no effort to prevent people from getting on the steps, did you?

A No, sir.

Tr. 2088, JA 1278. Moreover, Chief Powell in answer to the question "What is it that these 1200 people were doing which you felt justified ordering them to leave?" never listed the intelligence information, but stated the following factors: (1) radio messages that the Speaker's office was afraid that people would break into the Capitol through windows, although he saw no one breaking windows; (2) some four or five persons were climbing lampposts; (3) some one or two people were writing on the walls; (4) the protestors' "hostile attitude" which Chief Powell "heard and saw there"; (5) the crowd's "chanting and reaction towards police officers and myself." *See* Tr. 2108–2112, JA 1298–1302. Finally, Chief Powell testified as to his understanding of the *Nicholson* opinion in the following way:

Q [by plaintiffs' attorney] * * * Was it your understanding that in view of the requirement in the footnote to the Nicholson decision [footnote 22] * * *, that before you can make any arrests or ask anyone to leave the Capitol grounds, there [*sic*] *conduct* must be disruptive of the business of Congress to a greater degree than is ordinarily permitted by groups on the Capitol grounds?

A Yes, sir. * * *

Tr. 2149, JA 1339 (emphasis added).

Finally, even if specific intent to disrupt the Congress were a crime under *Nicholson*, we think the record, viewed in the light most favorable to plaintiffs, would support an inference that it was unreasonable for Chief Powell to have believed that all 1,200 arrestees had such a specific intent. For this reason the arrest of the crowd *as a whole* could not constitutionally have been predicated on the specific intent of some, but only on a refusal to quit. *See* note 31 *infra*.

For the reasons stated above, the fact that some crowd members may have had a specific intent to disrupt Congress does not in any way require a modification of the argument in text.

31. In addition to the analysis set out in text, points made by another panel of this court in *Washington Mobilization Committee v. Cullinane,* 184 U.S.App.D.C. ——, 566 F.2d 107 (No. 75–2010, decided April 12, 1977), are directly relevant here. There the court faced the question whether the police were justified in arresting demonstrators innocent of any violence or obstruction along with others who were violating the law, or whether the only constitutionally valid procedure would be to arrest lawbreakers individually. After ruling that the police may not be expected or required to single out individuals once a demonstration becomes "substantially infected with violence or obstruction," 184 U.S.App.D.C. at ——, 566 F.2d at 120, the court qualified its holding by indicating:

We do not suggest of course that one who has violated no law may be arrested for the offenses of those who have been violent or obstructive. As we have seen however the police may validly order violent or obstructive demonstrators to disperse or clear the streets. If any demonstrator or bystander refuses to obey such an order *after fair notice and opportunity to comply,* his arrest does not violate the Constitution even though he has not previously been violent or obstructive.

*Id.* (emphasis added; footnote omitted). In a footnote the court indicated that it was given some "pause" by the fact that some arrestees may not have heard orders to disperse. *See* 184 U.S.App.D.C. at ——, 566 F.2d at 120 n.4.

The record here indicates that not all of the arrestees were violent or obstructive or noisy—indeed, plaintiffs introduced testimony that only a small minority of the demonstrators were involved in any mischief. Thus not everyone arrested was violating the Capitol Grounds statute even as that statute is interpreted by Chief Powell. Accordingly, *Cullinane* would require notice and an opportunity to disperse before arrests of the crowd "as a unit" would be constitutionally permissible. Moreover, the "fair notice" required by the *Cullinane* court is

■ Even if *Nicholson* were not conclusive on the need to give an order and opportunity to disperse before arrest under Section 124, facts peculiar to this case would have required such an order. First, it is undisputed that Speaker Albert had in fact suspended Section 124 prior to the time any arrests were made.[32] Chief Powell testified that his understanding of Speaker Albert's instructions was that the protestors were to be allowed to remain while Members of Congress were speaking unless the crowd became disorderly, in which eventuality *"we should ask these people to leave*; if they refused to leave, that we would have to take whatever steps necessary."[33] With the statute suspended, there was no law which the plaintiffs could have been violating even if the *Nicholson* conditions were in fact present and, therefore, there was no probable cause for arrest—and no reasona-

ble ground for believing that there was— until the suspension expired by its terms, one of which was that a dispersal order be given.

■ Second, the protestors were unquestionably granted an unwritten "permit," as described in *Nicholson*, to assemble on the Capitol Grounds and steps.[34] Because "police officials * * * in effect told the demonstrators that they could meet where they did," "to sustain [plaintiffs'] later conviction for demonstrating where they told [them they] could 'would be to sanction an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him.'" *Cox v. Louisiana*, 379 U.S. 559, 571, 85 S.Ct. 476, 484, 13 L.Ed.2d 487 (1965), citing *Raley v. Ohio*, 360 U.S. 423, 426, 79 S.Ct. 1257, 3 L.Ed.2d 13, 44 (1959).[35] In these circum-

notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making. *See Washington Mobilization Committee v. Cullinane, supra,* 184 U.S.App.D.C. at ——, 566 F.2d at 120 n.4.

**32.** *See* Tr. 2553–2554, 2556–2557, 1996–2000, JA 1561–1562, 1564–1565, 1220–1224.

**33.** Tr. 1959, JA 1180 (emphasis added). Chief Powell introduced a stipulation that Speaker Albert would also testify that he told Powell to disperse the crowd and, only if they would not leave, to make arrests. Tr. 2505–2506, JA 1514–1515.

**34.** It was generally known that the purpose of the May 5 meeting at the Capitol Grounds was to hear speeches by Members of Congress and to present to them a petition, the so-called People's Peace Treaty. Tr. 440, JA 293. From this fact alone any plaintiff familiar with precedents of administration of the Capitol Grounds statute could reasonably have concluded that "permits" had been issued, since the Capitol Police had in the past allowed persons invited to the Capitol by Members to come and go freely. *See United States v. Nicholson, supra* note 19, Appendix at [6]–[7] & n.9. In fact, the events of May 6 offer further proof that both congressmen and Capitol Police officers thought that individual congressmen could suspend 9 D.C.Code § 124 (*i. e.*, that they could grant a "permit"). Thus, although the line of marchers was initially stopped at the border of the Capitol Grounds by Inspector Xander of the Capitol Police, he stepped aside upon being told by Representatives Dellums, Abzug, and Mitchell that they had invited the marchers to meet with them. Tr. 2552, JA 1560. In addi-

tion, no efforts were made to keep the protestors from assembling on the steps. *See* Tr. 2088, JA 1278, quoted at note 29 *supra. See also* Tr. 563–564, 763, JA 407–408, 594. There can be no doubt that these actions constituted police permission to assemble on the steps and, indeed, defense counsel even conceded that the plaintiffs had been "allowed to go on the steps." Tr. 739, JA 570.

**35.** The factual and legal situation in *Cox* is very similar to that presented here. There Reverend Cox and a group of civil rights demonstrators had been permitted to congregate on a sidewalk across from the courthouse in Baton Rouge, Louisiana. *See* the companion case, *Cox v. Louisiana*, 379 U.S. 536, 538–544, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). Cox was subsequently convicted of picketing "near" the courthouse.

The Supreme Court refused to strike down the picketing statute as facially invalid because it recognized that Louisiana had legitimate interests in protecting courts from undue pressures. *Cox v. Louisiana,* 379 U.S. 559, 560–564, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). The Court further held that the word "near" was not precise, but was sufficiently amenable of nondiscriminatory application that the statute was not unconstitutionally vague. *Id.* at 568–569, 85 S.Ct. 476. Nonetheless, the Court indicated that Cox could not be convicted because due process would be offended were the conviction allowed to stand when the "highest police officials of the City in the presence of the Sheriff and Mayor, in effect told the demonstrators that they could meet where they did * * *." *Id.* 379 U.S. at 571, 85 S.Ct. at 484.

stances, no constitutionally valid arrest could have been made until an order to disperse had been given which was itself based on permissible considerations. *See Cox v. Louisiana, supra,* 379 U.S. at 571–573, 85 S.Ct. 476.

■ For the reasons stated above, plaintiffs could not constitutionally have been arrested *as a group* under either 9 D.C.Code § 124 or 22 D.C.Code § 3102 unless Chief Powell had reason to believe: (1) that the plaintiffs comprised one of the groups that could be banned or ordered from the Capitol under *Nicholson;* (2) that orders to disperse had been given which apprised the crowd as a whole that it was under an obligation to leave; and (3) that a reasonable opportunity had been given the plaintiffs to leave the Capitol. This conclusion, drawn from *Nicholson, Cox,* and the language of Section 124—all sources predating May 5, 1971—in our judgment represents well settled law which Chief Powell was obliged to know on pain of losing his qualified immunity. *See Wood v. Strickland, supra,* 420 U.S. at 321–322, 95 S.Ct. 992.

### 2. Standard of Review and the Evidence

As we have already indicated, Chief Powell bears the burden of proof on the issue of his immunity. While this does not rule out the possibility of directing a verdict in his favor, it does require Chief Powell to demonstrate that the facts on each element of the immunity defense, taken in the light most favorable to appellees, are nonetheless so clearly in Chief Powell's favor that "reasonable men could entertain no doubt with

regard thereto." *Norfolk Southern R. Co. v. Davis Frozen Foods, Inc.,* 195 F.2d 662, 665 (4th Cir. 1952); *accord, e. g., Dehydrating Process Co. v. A. O. Smith Corp.,* 292 F.2d 653, 656 n.6 (1st Cir.), *cert. denied,* 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961); *American Casualty Co. v. Gerald,* 369 F.2d 829, 833 (4th Cir. 1966).

With this standard in mind, we now review the evidence tendered by Chief Powell as conclusively establishing his case.

■ First, under *Nicholson* Chief Powell was required to establish that it was reasonable to believe that plaintiffs constituted a group that was more noisy and more disruptive than other groups allowed on the Capitol Grounds.[36] On this issue Chief Powell relies primarily on his own testimony to the effect that he was faced with an unruly, noisy, out-of-control mob from the moment he arrived at the Capitol steps. Plaintiffs, on the other hand, introduced evidence that equally noisy, unruly events had been held on the Capitol steps with no adverse action being taken by the police. In addition, officials testifying on behalf of the defendants stated that the demonstration was "fairly mild"[37] and that no violation of the Capitol Grounds statute had occurred.[38] Indeed, even Chief Wilson, a co-defendant, stated that "it was a reasonably orderly crowd," marred by only "a few particular misbehaviors."[39] Finally, plaintiffs introduced evidence of an out-of-court statement by Chief Powell to Congressman Rangel, made on the evening of May 5, that "[the demonstration] was one of the more

Judge Greene's construction of § 124 is strikingly similar. In *Nicholson* he recognized that Congress had a legitimate interest in being free to conduct its business without interference and to be secure from violence and, further, that the public had an interest in being able to visit the Capitol in safety and free from unreasonable obstruction of roads and pathways. *See United States v. Nicholson, supra* note 19, Appendix at [11]–[16]. What constituted an unreasonable interference with Congress or the public was left to the administrative judgment of the police, subject to the construction set out in text at note 24 *supra.* Thus, when Inspector Xander allowed the plaintiffs to come onto the grounds and when no efforts were made to

block the Capitol steps, *see* notes 30 & 34 *supra,* the plaintiffs, like Reverend Cox, were entitled to rely on the administrative construction of the statute and to assume that they were lawfully assembled, until told otherwise.

36. *See* text at note 24 *supra.*

37. Testimony of Capitol Police Captain Ferguson, Tr. 3480, JA 1846.

38. *See* testimony of Assistant United States Attorney Larimer, Tr. 709, 735, 741, JA 540, 566, 572.

39. Tr. 1589, JA 962.

peaceful crowds that [Powell] had seen on the Capitol steps." [40] Thus not only was the actual characterization of the events of May 5 contested, but the veracity of Chief Powell in testifying as he did was directly in issue. Given this state of the evidence, the issue was indisputably one for the jury.

■ The evidence is similarly in conflict on the question whether Chief Powell made a *bona fide* effort to make sure the crowd heard his dispersal order. Although there was certainly evidence that the jury could credit to the effect that Powell made attempts to inform the crowd and was each time hooted down and drowned out, there was also evidence that Chief Powell realized that the crowd had not heard his warnings and yet took no steps to correct the situation. For example, a reporter present at the scene testified that he had overheard Chief Powell say to Chief Wilson "that he [Powell] wasn't sure whether they [the demonstrators] heard him or not or [that] he didn't think a lot of them heard him.[41] Regardless of this, no further warnings were made, although such warnings were required by Chief Powell's regulations. Nor was use made of a powerful police sound truck that was apparently at the scene, nor was any attempt made to use the public address system of the demonstration's leaders; indeed, an offer from Congressman Dellums to make announcements over that system was specifically refused by Chief Powell.[42]

■ Finally, a jury would in our judgment be entitled to conclude that Chief Powell was not acting in good faith. As we have already noted, Chief Powell's out-of-court admission to Congressman Rangel would belie Powell's claim of good faith. So also would Chief Powell's inaction after his remark to Chief Wilson which indicates that Powell was aware that notice to the crowd had been inadequate. Buttressing the inference of bad faith [43] is the further fact that Chief Powell, by relying exclusively on dispersal orders shouted over a hand-held bullhorn in attempting to give notice, violated his own "Procedure for Handling Protest Groups" [44]—a regulation issued over Chief Powell's signature.

40. Tr. 4297, JA 2166. *See also* text at note 75 *infra.*

41. Tr. 819–820, JA 644–645.

42. Tr. 747, JA 578; Tr. 485, JA 335. Chief Powell urges in brief that the fact that no one heard his warnings was due to the loudness of the crowd and, therefore, was not his fault. We are not impressed with this argument. In any situation in which an order to disperse can constitutionally be given there will be substantial noise or disorder, see *Washington Mobilization Committee v. Cullinane, supra* note 31, 184 U.S.App.D.C. at ——, 566 F.2d at 120. For this reason police will either have to warn each demonstrator individually or work through the leaders of a demonstration to the extent they have access to powerful public address systems. *See* text at note 44 *infra.* Alternatively, it appears that a device called a "sound curdler" is available which can make the police heard over most tumult:

Q. What is the curdler that you referred to?

A. That is an audio curdler that we had installed on top of the barricade car, which is a converted Brinks wagon kept in the yard up at the Tactical Unit. This particular curdler was bought in 1970 from Applied Electronics over in Alexandria because of the fact we had given a lot of instructions on bullhorns, which is the small audio handler that people claimed they could not hear distinguished over the roar of the crowd.

The curdler was guaranteed to be heard for at least a mile * * *. [I]t works very well as far as getting the message out to a crowd. Testimony of Theodore Zanders, Commanding Officer, Metropolitan Police Department Special Operations Division, Tr. 2349–2350, in *Washington Mobilization Committee v. Cullinane,* 400 F.Supp. 186 (D.D.C.1975), *rev'd,* 184 U.S.App.D.C. ——, 566 F.2d 107 (No. 75–2010, decided April 12, 1977). This curdler unit was apparently at the Capitol. *See* Tr. 747, JA 578.

Parenthetically, it should be noted that Zanders' testimony in *Cullinane* would tend to indicate that Chief Powell should have been aware that the hand-held bullhorn he testified he used to give his orders was not powerful enough to reach the crowd.

43. *Cf. Hupart v. Board of Higher Education of the City of New York,* 420 F.Supp. 1087, 1108 (S.D.N.Y.1976).

44. Federal Exhibit 11. This regulation states that:

PRELIMINARY TO ARRESTS the ranking official in charge at the scene [in this case Chief Powell] shall approach the demonstration leadership and explain the law violations

Notwithstanding the obvious conflicts in the evidence set out above, Chief Powell would have us direct a verdict on the theory that advice of counsel is an absolute defense and that the facts show conclusively that he relied on counsel present at the Capitol. This position is untenable both as a matter of law and as a basis for directing a verdict on the facts of this case.

■ The only point on which advice of counsel is claimed as a defense is the question whether plaintiffs constituted a group that could be ordered from the Capitol pursuant to the *Nicholson* opinion. It is not claimed that counsel advised Chief Powell that he could arrest plaintiffs without first giving them an order to disperse; accordingly, the scope of counsel's advice was not enough to create a complete defense. Nor would advice of counsel be a defense unless it was sought in good faith.[45] Since a directed verdict would not have been proper on the good faith issue, it follows directly that no such verdict could be given on the strength of advice of counsel.

■ In any event, this is not a case where advice of counsel should make Chief

Powell's belief on the *Nicholson* point *per se* reasonable. The law here was not highly technical, penetrable if at all only with the help of counsel. The controlling case was *Nicholson*, with which Chief Powell was fully acquainted. In addition, the central probable cause issue was one of fact: were the plaintiffs more noisy or disruptive than those routinely allowed onto the Capitol Grounds? On this issue Chief Powell, the officer in charge of the Capitol and a man of long experience, was obviously as expert as any counsel who might give him advice.

■ In addition, appellees raised a serious question of fact concerning whether Chief Powell had fully disclosed the House Speaker's orders to his legal advisor, Assistant United States Attorney Zimmerman, prior to asking his advice. Powell's own testimony shows conclusively that the piece of advice primarily relied on by Chief Powell—Zimmerman's agreement with Powell upon arriving at the Capitol steps that "this is a most flagrant violation of 9–124"—was rendered before Powell was advised that the Speaker had in fact suspended Section 124.[46] Chief Powell could not reasonably

which are being committed. He shall request that any and all violations be corrected immediatly [sic]. If such request is complied with, no further police action shall be taken.

If the leaders do not comply with the request, the official shall publicy [sic] announce to the crowd through a voice amplification the following * * *:

"I am * * *. I hereby inform all persons assembled that you are in violation of (state the regulation in general terms and give stature [sic] number in Code if known). In the name of the United States Capitol Police Board, I command all of you here assembled to disperse * * *. * * *

The official in charge shall wait a reasonable length of time for compliance. If after this first announcement nothing develops the Official shall repeat the aforstated [sic] order. * * *

* * * * * *

ARRESTING OFFICERS shall accompany the transporting officers to the proximity of the individuals about to be arrested. The arresting officer shall state to the violator that you are in violation of (give law violated). When applicable state "You are requested to please depart this area immediately and peacable [sic] or you shall subject yourself to immediate arrest." * * *

*Id.* at 4–5. At trial Chief Powell maintained that he could not ascertain who the leaders of the demonstration were, although he further admitted that he made no attempt to locate any of the congressmen who had invited the group onto the steps. *See* Tr. 2094–2095, JA 1284–1285. Nor apparently was any attempt made to use the sound amplification equipment of the demonstrators to give dispersal orders. Chief Powell admitted that he never identified the statute alleged to have been violated. Tr. 2103, JA 1293. Chief Powell admitted that he knew for a fact that "none of the arresting officers made the statement [to leave or be arrested] and gave that last opportunity to leave to the people who were being arrested * * *." Tr. 2105, JA 1295.

45. *E.g.,* Restatement (Second) of Torts § 666(1)(a) (1970).

46. Chief Powell testified that this advice was given to him between 2:56 and 3:00 P.M. on May 5. Tr. 1951–1952, JA 1175–1176. Immediately after this Chief Powell gave the first of a series of orders to disperse. Tr. 1952, JA 1176. Chief Powell later testified that Inspector Xander reached him with the information that the Speaker had suspended § 124 after he had given this first set of warnings. Tr. 1999, JA 1223.

have continued to act on that advice once he became aware of the Speaker's wishes. Nor would reliance on counsel offer any defense unless Chief Powell had disclosed to his attorney all the facts and circumstances surrounding the Speaker's orders.[47] Yet on the critical question of whether Attorney Zimmerman was informed of the Speaker's suspension of Section 124, Attorney Zimmerman testified: "I have no recollection of that [the fact of suspension] being told me at the time in question."[48] Indeed, although Chief Powell admits being told of the Speaker's orders, he did not claim at trial that he conveyed this information to Attorney Zimmerman. Viewing this evidence in the light most favorable to the plaintiffs, an inference can be drawn that Attorney Zimmerman counselled Chief Powell in ignorance of critical material facts. Accordingly, the validity of the advice of counsel defense was properly a question for the jury.

B. *New Trial—Defective Jury Instructions*

As a first alternative to his argument in favor of a directed verdict, Chief Powell argues that regardless of the sufficiency of the evidence, a new trial is required on the false arrest claim because the trial judge erred in instructing the jury with respect to the qualified official immunity defense. Our discussion thus far disposes of most of Chief Powell's objections and we will not rehearse those objections and our responses here. One point remains, however.

■ Focusing on selected parts of the jury instructions, Chief Powell complains that the jury was erroneously instructed that immunity could be made out only if there was probable cause. While we agree that Chief Powell could defeat liability by showing reasonable grounds to believe that probable cause existed—plus, of course, subjective good faith—we do not agree with his interpretation of the jury instructions. As the instructions were originally given, the trial court did use the terms "probable cause" and "reasonable grounds to believe probable cause existed" interchangeably. Upon objection, however, the court further instructed the jury that "[t]here is no difference between 'probable cause' and 'reasonable grounds to believe.'"[49] There was no further objection. The supplemental instruction, obviously incorrect as a general proposition, had the effect in context of equating "probable cause" with the trial court's extended instruction on qualified official immunity.[50] No mention of a different or more stringent mean-

---

47. *See, e.g.,* Restatement, *supra* note 45, §§ 662, 666(1)(b). *See also Anthony v. White,* 376 F.Supp. 567, 573 (D.Del.1974) (applying Restatement rule to § 1983 action for false arrest and false imprisonment).

48. Tr. 3904, JA 2045.

49. Tr. 70–71, JA 2352–2353.

50. You are instructed that if Chief Powell in good faith and reasonably believed that the [plaintiffs] could properly be characterized as one of the groups described in the Nicholson case, then Chief Powell was justified in ordering their dispersal.

In determining whether Chief Powell acted reasonably and orderly *[sic]* in dispersing them, you are instructed that Chief Powell is entitled to rely on traditional sources for the information on which he based his decision to order the Plaintiffs to disperse.

Your determination as to whether Chief Powell acted reasonably should not be based on hindsight, but rather on the facts and circumstances and the information available to Powell at the time he gave the order.

If you find that Chief Powell acted reasonably in ordering the dispersal, then in your determination as to whether these arrests were lawful, you must also decide whether Chief Powell acted in good faith.

Good faith in this context simply means that Chief Powell ordered the Plaintiffs to disperse for the purpose of enforcing the Capitol grounds statute rather than for some other reason which cannot be the basis of a lawful order to disperse, or cannot be the basis for a lawful order to either disperse or arrest somebody.

\* \* \* \* \* \*

If Defendant Powell has established that he acted on the basis of a reasonable good faith belief in the light of all of the circumstances, \* \* \* then he is not liable for false arrest. Otherwise he is.

Tr. 18–23, JA 2300–2302. These instructions are impeccable. *See* pp. ——–—— of 184 U.S. App.D.C., pp. 176–177 of 566 F.2d, *supra.*

ing of "probable cause" was made at any point in the jury instructions; consequently the jury could not have been confused that the issue of immunity was to be resolved in accord with the court's extended instruction on the subject. Accordingly, there is no error.

### C. *New Trial—Erroneous Introduction of Inflammatory Evidence*

As yet another alternative Chief Powell argues that he should be afforded a new trial because the first trial was tainted by admission of evidence on the bad faith and malice issue through the testimony of non-party class members, which was of the form: "I saw an unidentified policeman beat an unidentified demonstrator while arresting him." Prejudice is not only said to rest on the inflammatory nature of such testimony, but is also said to be intimately linked to the fact that this suit was litigated as a class action. Frankly, we find the latter objection muddled and extremely difficult to understand, but we will attempt to address it as best we can.

■ Apparently Chief Powell's position is that, because the witnesses through whom this testimony was introduced were mostly unnamed class members, he was caught by surprise since he had not deposed these persons and since even if he had sought discovery the Federal Rules of Civil Procedure would not have allowed it. Chief Powell's reading of the Federal Rules is patently incorrect. While it is true that discovery against absentee class members under Rules 33 and 34 cannot be had as a matter of course, the overwhelming majority of courts which have considered the scope of discovery against absentees have concluded that such discovery is available, at least when the information requested is relevant to the decision of common questions, when the interrogatories or document requests are tendered in good faith and are not unduly burdensome, and when the information is not available from the representative parties. *See Clark v. Universal Builders, Inc.,* 501 F.2d 324, 340–341 (7th Cir.), *cert. denied,* 419 U.S. 1070, 95 S.Ct.

657, 42 L.Ed.2d 666 (1974); *Brennan v. Midwestern United Life Ins. Co.,* 450 F.2d 999, 1005 (7th Cir. 1971), *cert. denied,* 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972); *United States v. Trucking Employers, Inc.,* 72 F.R.D. 101, 104–105 (D.D.C.1976); *Robertson v. National Basketball Ass'n,* 67 F.R.D. 691, 699–700 (S.D.N.Y.1975); *Bisgeier v. Fotomat Corp.,* 62 F.R.D. 118, 119–120 (N.D.Ill.1973); *Gardner v. Awards Marketing Corp.,* 55 F.R.D. 460 (D.Utah 1972); *cf. Wainwright v. Kraftco Corp.,* 54 F.R.D. 532, 534–535 (N.D.Ga.1972) (although discovery under Rules 33–34 is not proper, discovery under Rules 30, 31, and 45 is proper and appropriate orders will be entered to ensure that defendant can adequately prepare its case). *But see Fischer v. Wolfinbarger,* 55 F.R.D. 129 (N.D.Ky.1971).

■ That Chief Powell did not get depositions from absentee class members who would be witnesses, therefore, only underscores the fact that he made no effort to take *any* discovery from such witnesses. Indeed, Chief Wilson and the District of Columbia took no discovery of anyone. Yet the names of all class members were in the hands of the District of Columbia. These names were made available to plaintiffs' counsel some time in the summer of 1973—18 months before trial began—in conjunction with sending notice to class members. Moreover, there is no indication in the record that Chief Powell or any other defendant ever asked for a list of prospective witnesses. Because the defendants in this suit failed to take even elementary steps to protect themselves from surprise, they cannot now be heard to complain.

■ Having argued that he was deprived of discovery of relevant evidence, Chief Powell also argues an opposite proposition: that testimony regarding assaults and batteries committed by policemen was irrelevant and should have been excluded as inflammatory. The difficulty with this argument is that no objection was taken below on the grounds now asserted and the grounds stated below were not valid. Appellants asserted surprise; there was none other than that caused by their own failure

to seek discovery. Reacting to class counsel's argument that such information was relevant to determine the level of damages, appellants properly objected to the relevance of the evidence on that score, but did not object when the court ruled that the testimony was relevant to the issue of the bad faith and malice of Chiefs Powell and Wilson at the time of the arrests.[51] Indeed, appellants' own cautionary instruction—which was given virtually verbatim by the trial judge [52]—recognized the relevance of the challenged evidence for the limited purpose of showing bad faith.[53] Moreover, soon after the trial judge rejected class counsel's argument concerning relevance on

the damages issue,[54] he cut off additional challenged testimony as repetitious and inflammatory.[55] In these circumstances, we see no ground for reversal.

### D. New Trial—Failure to Create Appropriate Subclasses

As a final alternative Chief Powell argues that trial of the false arrest claim by class action caused him to lose defenses he might otherwise have had if plaintiffs had proceeded against him individually or if appropriate subclasses had been formed at the time this case was submitted to the jury.[56] This argument raises whether the defendant police officer is entitled to qualified official immunity. See pp. —— – —— of 184 U.S.App.D.C., pp. 174–177 of 566 F.2d, supra. That is the only issue relating to liability for false arrest which was actually presented to the jury in this suit. The qualified official immunity issue would be tried by substantially the same evidence no matter who brought suit or whether suit was brought individually, by joined plaintiffs, or by a class. The commonality of evidence relevant to a belief that a crime had been committed in the instant case is further attested by the fact that the United States Attorney, in trying the criminal case against eight class members, told class counsel that any eight individuals could be used as test case defendants and that defense counsel could pick the eight. See Tr. 4130–4131, JA 2136–2137. It is precisely this situation—in which each class member would have to present the same case were he to proceed individually—to which Rule 23(b)(3) is addressed since a class action would in such circumstances consolidate otherwise identical actions into a single efficient unit.

Nor do we think that determination of damages in this case requires individualization. As the suit was tried, damages were fixed either for the class as a whole or by subclass. See note 6 supra. Assignment of plaintiffs to appropriate subclasses can apparently be made by a review of police and court records. Chief Powell has nowhere objected to this mode of determining damages, and we see no difficulties with it.

Moreover, whatever the merits of Chief Powell's arguments might have been had they been directed to the trial judge during the pretrial stage of this case, which they were not, those merits are substantially diminished on appeal since the only issue before an appellate court is whether the trial judge abused his discretion in granting class status. See Bermudez v. United States Department of Agriculture, 160 U.S.

---

**51.** See Tr. 932–934, JA 721–723.

**52.** Compare federal defendants' Jury Instruction 12, JA 198, with JA 2309.

**53.** The text of the instruction given the jury was:

[I]n considering the liability of the defendants in this case, you may not take into consideration any of the evidence involving any of those acts [of assault and battery] by unnamed police officers or other unnamed and unidentified persons, except as you determine that they were committed under the guidance or supervision of the defendant. JA 2309 (emphasis added). Since the subjective good faith of the defendants had been put in issue by assertion of an affirmative defense of good faith immunity, we agree that evidence that the defendants guided policemen in assaults on demonstrators was directly relevant.

**54.** See Tr. 931–934, JA 720–723.

**55.** See Tr. 996–999, JA 755–758; Tr. 1047–1048, JA 777–778.

**56.** Chief Powell also makes the argument that this case was improperly certified at the outset since "questions of law or fact common to the members of the class [did not] predominate over any questions affecting only individual members * * *." Rule 23(b)(3), Fed.R. Civ.P. The basis for this proposition is a citation to the Rules Advisory Committee's comments to the 1966 amendments of Rule 23: "A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions * * * would be present, affecting the individuals in different ways." 39 F.R.D. 63, 103 (1966).

We cannot accept Chief Powell's overly mechanical equating of false arrest with a "mass accident." As to liability, the only question generally to be tried in a false arrest suit is

two questions: whether Chief Powell presented the theories now pressed by way of motion, proposed jury instruction, or objection to jury instructions in a manner likely to have apprised the trial judge of his contentions before the case was irretrievably submitted to the jury[57] and whether the theories now tendered are in any event correct and supported by evidence introduced at trial.[58]

Chief Powell's argument, in short, is that the record shows that four to five persons were climbing on Capitol lampposts, that one or two persons were writing on the walls of the Capitol, that one named plaintiff—David L. Preiss—heard warnings to disperse yet did not do so, and that a group of 100 persons who were originally across the street from the Capitol steps heard orders to disperse and yet failed to do so.[59] As to the climbers and writers, he asserts that there were unquestionably valid grounds for arrest. As to Preiss, Powell suggests that the jury instructions actually given were erroneous because there was no question that Preiss willfully refused an order to leave. Similarly, probable cause to arrest the second group of 100 protestors is alleged to be found in an order by the Capitol Police Board to clear the Capitol which was communicated to this group and which they willfully disobeyed.

We begin by considering to what extent these arguments have been waived by fail-

App.D.C. 150, 157, 490 F.2d 718, 725, *cert. denied,* 414 U.S. 1104, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973); *accord, Paton v. LaPrade,* 524 F.2d 862, 875 (3d Cir. 1975); *Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791, 792–793 (10th Cir. 1970). Therefore, in the absence of a showing that certification affected the "substantial rights of the parties," Rule 61, Fed.R.Civ.P., it is doubtful that reversal of certification on appeal would ever be appropriate. Our discussion in text deals fully with all points which might affect such substantial rights of Chief Powell.

57. Contrary to appellants' suggestions in brief, plaintiffs' counsel does not have an obligation under Rule 23 to anticipate affirmative defenses which may be raised to a class claim and to make motions for subclassing should he suspect that defendants will put in issue a theory requiring decomposition of the class. If an affirmative defense is not raised by a defendant, it is not tried and no useful purpose would be served by burdening plaintiff with an obligation of putting the class suit in a posture to try claims that a defendant would never assert. In addition, the need for class decomposition may depend on the nature of the proofs to be tendered in support of an affirmative defense. Since the defendants will control such proof, it is · only sensible to require the defendant to bring to the attention of the court and the other parties any proof which will require class decomposition. As we indicated, *see* pp. —— – —— of 184 U.S.App.D.C., pp. 174–177 of 566 F.2d, *supra,* all arguments going to immunity or probable cause for a warrantless arrest are affirmative defenses. Accordingly, a major issue to be resolved is whether defendants adequately raised below their substantive defenses and related procedural needs.

58. In assessing whether Chief Powell lost any "substantial rights," *see* note 56 *supra,* we need not consider defenses theoretically available to him unless evidence introduced at trial would warrant submission of the issue to the jury. Thus, even if trial of a defense would theoretically require subclassing, there would be no need to subclass unless the defense was supported by evidence.

59. Chief Powell also asserts error in the trial court's rejection of his instruction on mitigation of damages and consequent failure to create a subclass for those plaintiffs who allegedly enhanced their damages by refusing to cooperate promptly with police "processing" at the Coliseum. The trial court ruled that there was no evidence linking refusal to cooperate in processing with the duration of detention and, therefore, there was no factual predicate laid for a mitigation of damages instruction. We agree. Although appellants now assert that those who failed to cooperate were held much longer than those who processed quickly, they have not been able to draw our attention to any evidence in the record supporting such a claim, and we have found none. Indeed, a number of plaintiffs testified that they were among the first to process and yet they were held until late in the day on May 6 or into the early hours of May 7. *See Dellums v. Powell [District of Columbia Appeal],* 184 U.S.App.D.C. ——, ——, 566 F.2d 216, 225 n.30 (decided August 4, 1977). If the evidence discloses anything, it is that no effort was made by appellants to bring processed arrestees promptly before the judges of the Superior Court, who were sitting in continuous session, or alternatively that the congestion in the courts was so great that persons could not be arraigned as fast as they could be processed. In either case, plaintiffs could not have reduced their duration of incarceration by moving through processing lines at a faster pace.

ure of appellants to take appropriate procedural steps below. Chief Wilson and the District of Columbia (but no federal defendant) filed an opposition to plaintiffs' motion for class certification. This opposition did not suggest a need for subclasses and did not indicate that a critical element of appellants' case would be proof that some persons heard warnings to disperse. Instead, it alleged generally that the claims of the class—and particularly assault and battery claims, which were abandoned before trial—were not suitable for class action determination. Two days before trial was to begin, and three years after the complaint was filed in this suit, the federal defendants moved for reconsideration of class certification. This motion again challenged the overall propriety of class action treatment and did not request subclassing. It did, however, indicate that "[c]ertain of the plaintiffs admit that they heard warning [sic] to depart from the Capitol steps; other contends [sic] that they heard no such warning." [60] It was further indicated that "[s]ome members of the class were arrested at approximately 3:30 p.m., while in the presence of members [sic] of Congress; other members of the class were arrested considerably later, after all the initial arrest [sic] had been completed * * *." [61] No attempt was made in this two-page memorandum to relate these alleged facts to any relevant legal theory. Indeed, throughout this lawsuit Chief Powell has contended that no dispersal order was needed for any arrest and, had this theory been accepted, it would have been immaterial that some members of the class heard the warnings and some did not. In short, these pretrial pleadings, which requested decertification and not subclassing, were insufficient to put anyone on notice that defendants sought to submit to the jury defenses requiring subclassing.

At the close of all the evidence appellants made a series of motions for directed verdicts, and in the colloquy on those motions it first became clear that the trial court was going to rule that an order to disperse was a mandatory element of the offense for which plaintiffs had been arrested. Appellants' counsel pointed out that one plaintiff —Preiss, who was among the initial group of arrestees—had testified that he heard warnings to disperse and willfully refused to do so. At this point class counsel indicated that a subclass for Preiss should be created.[62] However, there was no mention of the second group of arrestees, or the climbers and writers, and no indication by appellants' counsel that they wished to try the claims of these groups as separate subclasses.

For reasons known only to the parties, the agreement reached as to Preiss was never written into the jury instructions tendered by either side. Nor was any objection to the absence of such a subclassing instruction made by defendants. We can only surmise that defendants made a tactical decision to abandon any attempt to prove this defense for fear of giving the jury the impression that their case as to the other 1,199 class members was weak or to avoid giving the jury an opportunity to "compromise" by holding for defendants on one claim while imposing liability for the claims of the other 1,199. Whatever the reasons, the trial judge never became aware of defendants' concern, if any then existed, that subclassing instructions had been improperly omitted from his extended and complicated charge. Nor did he become aware that anyone wanted a charge as to any other group of arrestees, since no jury instructions were tendered indicating this and no objections were raised to the absence of a subclass.

 In these circumstances, we do not think Chief Powell sufficiently apprised the trial court of his position—which was based on a few shreds of evidence in a complicated six-week trial—before the case

---

60. Memorandum of Points and Authorities in Support of Motion to Reconsider Class Action Determination, filed December 2, 1974, Docket Item No. 97.

61. Id.

62. Tr. 4382, JA 2239.

was submitted to the jury. Accordingly, Rule 51, Fed.R.Civ.P., now bars our consideration of these points.[63]

■ Moreover, Chief Powell's objections are at this point largely theoretical. No one testified that he could now identify those class members who were climbing or writing, and there was no contemporaneous recordation of any information which could lead to such an identification. Similarly, while it is plain that some 100 persons (out of 1,200) were arrested after the bulk of arrests had been made, it is also clear that Chief Powell has no means of identifying the members of this group. Arrest records made on the scene apparently do not differentiate between the initial arrestees and the 100, nor do the informations filed against the plaintiffs. Since defendants have not even tried to take discovery of any absentee class members, they cannot possess any admissions linking individual absentees to the second group of arrestees. Thus creation of subclasses to allow the jury to consider Chief Powell's present points would have been a meaningless gesture, and submission of the case to the jury on a class-wide basis has not affected the "substantial rights" of the parties.[64]

## II. MALICIOUS PROSECUTION

■ The jury found against Chief Powell on plaintiffs' malicious prosecution claim and awarded $3,000 to eight class members who stood trial on the criminal charges and $50 to all other class members. On this appeal Chief Powell challenges the sufficiency of the evidence to show that his actions caused the filing of criminal charges against the class. In his view the arrest at the Capitol does not constitute institution of criminal charges as that event is defined in the law of malicious prosecution.[65] Rather, filing of formal informations is the event which triggers tort liability, Chief Powell maintains, and an Assistant United States Attorney, Luke Moore, allegedly exercising his independent judgment, filed the informations lodged against class members.

■ The record shows the following. The decision whether to proceed with filing informations was made in a meeting on the night of May 5, 1971. At the meeting Chief Powell and Assistant United States Attorney Zimmerman, who had been advising Powell and who was an eyewitness to the events at the Capitol steps, conferred with Assistant United States Attorneys Hannon and Moore.[66] Powell and Zimmerman recounted the events of the day, and their story was memorialized in minutes not introduced into evidence. On the basis of this information, and apparently after some discussion between the three Assistant United

---

**63.** Any recognition of a "plain error" under Rule 51, Fed.R.Civ.P., which does not by its terms admit of any such "plain error" rule, should at least be limited to those circumstances in which plain error would be recognized under the express provisions of Rule 52, Fed.R.Crim.P. In a criminal case, however, the Supreme Court has indicated that

> [o]rderly procedure requires that the respective adversaries' views *as to how the jury should be instructed* be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error. *It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.*

Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (footnotes omitted; emphasis added). We see no reason why this is such a "rare case."

**64.** *See* note 56 *supra*.

**65.** Malicious prosecution has four elements: (1) the defendant must be found to have instituted a criminal action against the plaintiff; (2) that prosecution must have ended in the plaintiff's favor; (3) there must have been no probable cause to initiate the criminal proceeding; and (4) the defendant must have acted maliciously. A defendant is also allowed to submit to the jury that the plaintiff was guilty of the offense charged even though he was acquitted, but in this case defendants did not ask for such an instruction.

The second element was not contested. There was ample evidence introduced to support a verdict that Chief Powell had no probable cause to arrest the class plaintiffs. This same evidence would also be sufficient to support a jury verdict that Chief Powell acted maliciously. *See* 1 F. Harper & F. James, The Law of Torts § 4.6, at 321 (1956).

**66.** Attorney Moore testified that other police officers might have been at this meeting.

States Attorneys present, Attorneys Zimmerman and Hannon were directed to draw up informations against the arrestees. These informations were filed, apparently by Assistant United States Attorney Moore, by some time on May 6 since arraignments began some time in the late morning or early afternoon of that date.[67]

Subsequent to the filing of informations, Attorney Moore obtained statements from two other eyewitnesses, Assistant United States Attorneys Larimer and Marcy, who told somewhat different stories about the events of May 5. Attorney Larimer's report indicated some doubt that Powell had given proper dispersal orders and also called into question the level of noise and confusion at the Capitol. Attorney Marcy indicated that he did not think everyone in the crowd had heard warnings to leave, but that he did think the presence of a police cordon line at the bottom of the steps gave arrestees a warning that they might be arrested. Attorney Moore apparently interviewed Members of Congress and congressional staff personnel some time after the informations were filed. On the basis of this further investigation Attorney Moore, in consultation with United States Attorney Flannery, made the ultimate decision to prosecute a test case with eight defendants picked at random from among the arrestees. When that case failed it was also Moore who determined that charges against all other class members should be dropped.

The issue of causation raised by these factors appears to be a novel one in this jurisdiction. For this reason we begin with a sketch of general principles.

It is the "interest in freedom from unjustifiable and unreasonable litigation that receives direct and primary protection" from the tort of malicious prosecution.[68] Other interests, such as those in reputation, property, or liberty, are only secondarily protected.[69] For this reason courts have held that a private citizen who knowingly and maliciously presents false information to an official, but who fails thereby to cause process to issue, cannot be held liable for malicious prosecution.[70] Similarly, this court has held that a police officer who unreasonably or maliciously arrests an individual without a warrant cannot be held for malicious prosecution unless an information or indictment has been filed.[71] Thus, where injury to the interest primarily protected by the tort of malicious prosecution is absent, injury to interests secondarily protected is apparently insufficient to support liability under the tort.

The relevant question, therefore, is whether Chief Powell's involvement in triggering the filing of informations is of such a nature that the presumption of independent action by United States Attorneys is overborne and a chain of causation can accordingly be traced to Chief Powell. In resolving this question we draw on the law concerning the liability of private persons who lay facts before the police. In so doing, however, we intimate no view on whether police officers can be held to a higher standard than private individuals.[72]

The law is clear that the chain of causation between Chief Powell and the

---

67. An information or complaint must be filed by the time of arraignment of a person arrested without a warrant; otherwise the court must discharge the arrestee. Rule 7(a), Rules of Criminal Procedure of the Superior Court of the District of Columbia.

68. 1 F. Harper & F. James, *supra* note 65, at 301.

69. *Id.*

70. *Melvin v. Pence,* 76 U.S.App.D.C. 154, 156, 130 F.2d 423, 425 (1942); Restatement, *supra* note 45, § 653, comment *c*, at 407.

71. *See Auerbach v. Freeman,* 43 App.D.C. 176 (D.C. Cir. 1915).

72. Private individuals are immunized from tort liability so long as they do not act with malice, even if they act unreasonably. *See, e. g.,* Restatement, *supra* note 45, § 653, comment *g.* Whether police officers should be accorded such broad immunity is open to doubt, given police liability for unreasonable behavior in other areas of the law and the possibility that reports of a crime made by an officer to a prosecutor will inherently carry greater weight than similar reports made by a private individual. We need not decide this issue given the evidence in the record here.

filing of the informations against plaintiffs is broken—thereby defeating tort liability—if the decision made by Attorney Moore was independent of any pressure or influence exerted by Chief Powell and of any knowing misstatements which Powell may have made at the meeting on the evening of May 5.[73] Although the record does tend to show that complaints lodged against persons arrested at the Capitol or the White House are handled with special courtesy—which gives some pause with respect to the objectivity with which prosecutors can evaluate charges against those arrested for protesting the policies of the Congress or the President [74]—a generalized solicitude for complaints from those quarters, alone and unconnected to the events at hand, is not sufficient evidence to overcome the presumed independence of prosecutorial judgments made by United States Attorneys. Nor has it been shown that Chief Powell, by virtue of his official position, exerted any special influence over the judgment of such Attorneys. The record would, however, support an inference that Chief Powell had knowingly misrepresented material facts in the May 5 meeting with the Assistant United States Attorneys, for there was testimony that a "very uncomfortable" Chief Powell told Congressman Rangel on the evening of May 5 "that the defendants [class plaintiffs] were not that disorderly and that it was a peaceful crowd, but that [there] was nothing that he could do." [75] On the other hand, although such an admission following the arrest of 1,200 persons would certainly be the sort of thing that would be remembered, none of the persons who testified about the May 5 meeting indicated that Chief Powell had expressed any reservations about proceeding with informations.

Thus it seems extremely doubtful that Powell shared the reservations stated to Congressman Rangel with the Assembled United States Attorneys.

 Notwithstanding our conclusion that there was evidence from which the jury could have concluded that Chief Powell had procured the filing of informations by making misrepresentations to the prosecuting attorneys, we think Chief Powell should get a new trial on the malicious prosecution claim. The jury instructions stated only that the jury must find that "the defendant instituted a criminal proceeding." [76] We think this was error because no instruction was given defining the limited permissible meaning of the word "instituted" in the context of this case. To be sure, Chief Powell's counsel appears not to have made a formal objection below to the jury instructions, but our review of the record indicates a number of colloquies in which malicious prosecution was discussed with regard to both Chief Powell and Chief Wilson, and we are convinced that the trial judge was sufficiently apprised of the issue now raised to protect Chief Powell's right to appeal.

Without attempting to blueprint the further proceedings to be had on the malicious prosecution claim, we think it important to note two points needing further resolution. The evidence so far adduced shows that Attorney Zimmerman had a significant role in procuring prosecution of the plaintiff class. Whether this role was sufficient to absolve Chief Powell of liability is an issue so far unexplored by the parties which awaits further factual and legal elucidation best accomplished in the trial court. Second, the record also indicates that Attorney Moore turned to sources of information

---

**73.** *See, e. g.,* 1 F. Harper & F. James, *supra* note 65, at 306; Restatement, *supra* note 45, § 653, comment *g.*

**74.** The complaint in this case charged that Attorney General Mitchell and Deputy Attorney General Kleindienst had conspired with Chiefs Powell and Wilson to deprive May Week demonstrators of their civil rights. So far these allegations have not been proved, although the claims against Mitchell are yet to be tried. *See* note 1 *supra.* Had such a conspiracy been

shown, this would certainly have supported an inference that the judgment to prosecute was not independent.

**75.** Tr. 4297, JA 2166. These remarks were made on the evening of May 5. The decision to prosecute was apparently made late that evening or in the early morning hours of May 6.

**76.** Tr. 23, JA 2305.

independent of Chief Powell before making the decision to prosecute a test case. Since separate damages were awarded against Chief Powell to the eight test case defendants, further analysis should be given to whether Chief Powell's role as a major prosecution witness gave him a sufficient casual nexus to the decision to prosecute to support such additional tort liability.

For the reasons stated above, we vacate the judgment against Chief Powell insofar as it awards damages for malicious prosecution and remand this facet of the case for a new trial.

## III. FIRST AMENDMENT DAMAGES AND LIABILITY TO REPRESENTATIVE DELLUMS

Each class member and Congressman Dellums was awarded $7,500 for violation of First Amendment rights. Chief Powell challenges this verdict on a number of grounds: first, that there is no cause of action under *Bivens* for redress of First Amendment violations and that we should not create one; second, that there is insufficient evidence to sustain Congressman Dellums' contention that his First Amendment rights were violated and that, in any case, the damages awarded are grossly disproportionate to any possible harm suffered by him; and, finally, that the instructions on First Amendment damages were generally incorrect.

 Whether there is a cause of action directly under the Constitution for violation of First Amendment rights is a question so far left open by this court.[77] In *Bivens* Mr.

Justice Harlan, concurring specially, indicated that "courts of law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of Fourth Amendment rights."[78] Yet he opined that "[t]he same, of course, may not be true with respect to other types of constitutionally protected interests, and therefore the appropriateness of money damages may well vary with the nature of the personal interest asserted."[79] It is apparently this language that has given courts pause in analyzing whether a right of action should be implied directly from the Constitution for redress of violations of interests protected by other than the Fourth Amendment. Given the intangible nature of the liberty interests at stake in many Fourth Amendment cases and the broad familiarity of federal courts with equitable relief for First Amendment violations, it is difficult to identify here the impediments feared by Mr. Justice Harlan. Indeed, the Supreme Court has recently approved in principle the award of reinstatement and back pay relief for violation of First and Fourteenth Amendment rights of a non-tenured schoolteacher.[80] The unanimous Court dealt explicitly with the problem of causation and apparently found no difficulty in prescribing the elements of a cause of action and defenses thereto.[81]

 Here, moreover, there can be no question of causation, at least as to class members. If they were arrested while lawfully exercising "basic constitutional rights

77. *See Greenya v. George Washington University*, 167 U.S.App.D.C. 379, 385–386, 512 F.2d 556, 562–563 n.13, *cert. denied*, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975). *See also Cardinale v. Washington Technical Institute*, 163 U.S.App.D.C. 123, 128, 500 F.2d 791, 796 n.5 (1974) (reserving question of Fifth Amendment damage action under *Bivens*). Each of these cases involved firing of a non-tenured teacher, allegedly for improper reasons.

78. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, supra* note 7, 403 U.S. at 409, 91 S.Ct. at 2011 (Harlan, J., concurring).

79. *Id.* at 409 n.9, 91 S.Ct. at 2011.

80. *Mt. Healthy City School Dist. Board of Educ. v. Doyle*, 429 U.S. 274, 281–86, 97 S.Ct. 568, 573–75, 50 L.Ed.2d 471 (1977). Two circuits have now recognized a cause of action for damages implied directly from the First Amendment. *Paton v. LaPrade, supra* note 56, 524 F.2d at 869–871; *Yiamouyiannis v. Chemical Abstracts Service*, 521 F.2d 1392, 1393 (6th Cir. 1975).

81. *See Mt. Healthy City School Dist. Board of Educ. v. Doyle, supra* note 80, 429 U.S. at 286, 97 S.Ct. at 575.

in their most pristine and classic form," [82] the violation of First Amendment rights is directly attributable to the arresting officers. Dellums' complaint, broadly construed, also stated a First Amendment violation directly traceable to the arresting officers because the gravamen of that complaint was that Dellums' audience was arrested, thereby preventing him from speaking to them. As we have recently stated, " '[T]he point of ultimate interest [of the First Amendment] is not the words of the speakers, but the minds of the hearers,' " [83] and manifestly a speaker will be deprived of an opportunity to affect those minds if his audience is arrested and carted away. Certainly the harm is as great as if the speaker had himself been silenced. [84]

This brings us to the question whether the quantum of damages to be awarded for First Amendment violations is administrable by the courts. We think it is in principle no less administrable than damage awards for other intangible interests protected by the Constitution or at common law. The interest in freedom from apprehension of immediate invasion of one's person, protected for hundreds of years by the law of assault, is only one example of a non-quantifiable interest whose recompense in money damages is routinely left to a jury under proper instructions. The interest protected by the First Amendment in the context of this case is no less certain of quantification or conceptualization.

Basically, what is at stake here is loss of an opportunity to express to Congress one's dissatisfaction with the laws and policies of the United States. Staged demonstrations—capable of attracting national or regional attention in the press and broadcast media—are for better or worse a major vehicle by which those who wish to express dissent can create a forum in which their views may be brought to the attention of a mass audience and, in turn, to the attention of a national legislature. It is facile to suggest that no damage is done when a demonstration is broken up by unlawful arrests simply because one could write an individual letter to a congressman or because the demonstration might be held at another day or time. Few letters to congressmen command a national or regional audience. And often it is the staging and theatrics—if you will, the time, place, and manner of the demonstration—which express the passion and emotion with which a point of view is held. The demonstration, the picket line, and the myriad other forms of protest which abound in our society each offer peculiarly important opportunities in which speakers may at once persuade, accuse, and seek sympathy or political support, all in a manner likely to be noticed. Loss of such an opportunity is surely not insignificant. [85]

▮▮ That loss of an opportunity to demonstrate constitutes loss of First Amendment rights "in their most pristine and classic form" [86] does not mean, however, that monetary recompense should be extravagant. The award must be proportional to the loss involved insofar as it seeks to compensate intangible injuries. The jury cannot simply be set loose to work its discre-

---

82. *Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963).

83. *Home Box Office, Inc. v. FCC,* 185 U.S.App. D.C. ——, ——, 567 F.2d 9, 46 (decided March 25, 1977) (slip op. at 74), *quoting* A. Meiklejohn, Political Freedom 26 (1960).

84. Appellants also complain that it is not fair to subject police officers to the alleged perplexities of First Amendment law, perplexities which are further (incredibly) stated to be absent in the Fourth Amendment area. This argument might have more force were this a case about false arrest for obscenity, but even in such a case appellants' argument is self-defeating. We can readily agree that police cannot

be held to the standards of a constitutional lawyer, but it is precisely because of this that a broad good faith immunity is made available to the officer. It is extremely unlikely, therefore, that we are today setting a trap for the unwary policeman.

85. Of course, the right to engage in protest or demonstrations is not unlimited, however valuable it may be. *See United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

86. *Edwards v. South Carolina, supra* note 82, 372 U.S. at 235, 83 S.Ct. at 683.

tion informed only by platitudes about priceless rights. Comparing these principles with the instructions actually given the jury, we find error because those instructions did not require the jury to focus on the loss actually sustained by the plaintiffs. This is not, after all, a case in which the demonstration was thwarted altogether— the program of events was virtually complete before any substantial number of arrests had been made. In these circumstances, the $7,500 judgment is totally out of proportion to any harm that has been suffered, and therefore we vacate that judgment and remand this facet of the case for a redetermination of First Amendment damages.[87]

The judgment concerning Representative Dellums' damages must also be set aside for the reasons stated above. Contrary to appellants' contention, however, we think there was sufficient evidence that Congressman Dellums' rights were violated. According to his own testimony, which is largely uncontested and uncontradicted, Representative Dellums cut short his speech to the crowd in an attempt to stop the mass arrests which had begun just prior to that speech. He had planned to continue speaking once he accepted the People's Peace Treaty, but both that speech and presentation of the Treaty never occurred because the arrests thwarted completion of the dem-

onstration. Finding sufficient evidence to go to the jury, and there being no objection made to the jury instructions concerning liability to Representative Dellums, we affirm the jury's finding of liability and remand this claim for further proceedings not inconsistent with this opinion.

## IV. CONCLUSION

In the final analysis, the action below was in the mold of the classic jury trial.[88] In the course of a six-week trial over 60 witnesses appeared. The evidence was starkly clashing. The plaintiffs told of a peaceful and reasonably well organized march from the Mall to the Capitol and of a gathering on the steps that may have been marred by a few instances of misbehavior on the fringes but was on the whole peaceful, attentive, and no more noisy than other groups routinely allowed to use the Capitol for like purposes. The plaintiffs also told of police indifference to civil and human rights which was alleged to have been part of a conspiracy to quiet dissent through false arrest and preventive detention. Chief Powell, like our Brother Tamm, told of a week of violence and disorder, of intelligence concerning plans to invade the Capitol buildings, of fear for the safety of congressmen and congressional staff, and of noise, disorder, and confusion on the Capitol

**87.** The parties should consider whether, in the interests of efficiency and justice, First Amendment damages could be set by the trial judge on the record thus far adduced at trial.

**88.** The dissent apparently does not dispute that the case was properly submitted to the jury if only the record made at trial is considered, for "the shocking legal error in this case was the failure at trial and appellate levels to take judicial notice of the unfortunate acts of violence which [had] preceded the events involved in the present case." Dissent at —— of 184 U.S. App.D.C., at 214 of 566 F.2d. While we do not concede the validity of this remarkable claim of error, it should be pointed out that the record was replete with references to the violence and disorder of May 3–4, 1971. Chief Powell was allowed to testify fully as to his intelligence information concerning the motives of the plaintiff class and about his knowledge and understanding of the events of May 3–4. Plaintiffs' witnesses were consistently queried on cross-examination about their motives in

joining the May 5 rally and were asked whether they had participated in the events of May 3–4 or subscribed to the views of those who had participated. The jury was properly instructed that it should take into account "the facts and circumstances and the information available to Powell at the time he gave the [arrest] order," see note 50 supra, in evaluating whether there were reasonable grounds for arresting the plaintiff class. Moreover, Chief Powell, unlike our Brother Tamm, apparently did not think the violence of May 3–4 created probable cause to arrest on May 5. See note 30 supra. Finally, it can hardly be supposed that a jury drawn from the citizenry of the District of Columbia could be oblivious to the excesses and outrages of May 3–4. Yet such a jury has held in favor of the class not once, but twice: not only in the suit below, but also in the criminal trial which was held in July 1971 when memories of May Week were fresh and well known to all residents of the District.

steps. This mass of conflict, teeming with issues of credibility, went to the jury under an elaborate set of instructions which are, for the most part, impeccably correct. The jury held for the plaintiffs and except as noted here and in No. 75–1975, the jury's verdict is

*Affirmed.*[89]

[1]

APPENDIX

DISTRICT OF COLUMBIA COURT OF GENERAL SESSIONS

CRIMINAL DIVISION

CRIMINAL NUMBERS

20210–69A
20211–69A
20216–69A
20220–69A

UNITED STATES OF AMERICA, PLAINTIFF

v.

JOAN NICHOLSON, JIM B. HART, BOYKIN A. REYNOLDS, MARY E. VAN HUYCK, DEFENDANTS

OPINION

On June 4, 1969, defendants (together with nine others) were arrested for and charged with unlawful entry, in violation of D.C.Code § 22–3102. Two days later, prior to trial, defendants moved to dismiss the Informations on constitutional grounds. The testimony[1] taken on the motion con- cerned primarily the standards used in ad- ministering the laws relating to the use by the public of the Capitol Grounds. That portion of the testimony is detailed and discussed *infra,* principally at pp. 5–7 [—— of 184 U.S.App.D.C., 199–200 of 566 F.2d].

The evidence also showed that defendants (who are members of and sponsored by the Quaker Action Group) were arrested on the center steps of the East Front of the Capi- tol while they were reading a list of the Vietnam war dead from the Congressional Record. The arrests occurred when the de- fendants refused to leave in compliance

[2]

with an order from James M. Powell, Chief of the Capitol Police.[2] Other Quakers in groups of approximately the same size had previously been arrested when they en- gaged in similar conduct under the same sponsorship. There is an indication that these activities will continue.

I

The unlawful entry statute provides for the punishment of anyone who, being on public or private property "without lawful authority to remain . . . thereon", refuses to leave on demand of the person lawfully in charge. As applied to privately- owned land, this kind of law generally rais- es few difficult legal problems because ownership of such land ordinarily includes the right, arbitrarily or otherwise, to curtail admission and use.

---

**89.** The results of our decision here and in No. 75–1975 can be quickly summarized as follows:

 A. *False Arrest and False Imprisonment*: affirmed in all respects.
 B. *Violation of First Amendment Rights*: affirmed as to liability, damages vacated and new trial ordered.
 C. *Cruel and Unusual Punishment*: judg- ment vacated as duplicative and contrary to law.
 D. *Malicious Prosecution*: judgment vacat- ed, new trial ordered as to defendant Powell only.
 The joint and several liability of Chief Powell, Chief Wilson, and the District of Columbia is affirmed.

**1.** Those testifying were Congressman George E. Brown of California; Congressman Edward I. Koch of New York; Chief of the Capitol Police James M. Powell; Lawrence Scott, Exec- utive Secretary of the Quaker Action Group; and David Clark and William Bloom, two ob- servers of the allegedly illegal acts.

**2.** The Capitol Police declined to arrest the three Members of Congress who participated in this activity, although they waived their congres- sional immunity.

The application of trespass statutes to government land presents greater complexities. Some species of government property—*e. g.*, the offices of executives and those of many other government workers; conference chambers; scientific or research facilities; storage warehouses of valuable commodities—are entitled to be as immune from invasion by one not wanted on the premises as is private realty. But there are other types of government land—public parks, streets and sidewalks, and historic landmarks—which may not ordinarily be closed to the public for reasonable use. See *Hague v. C.I.O.*, 307 U.S. 496, 515–16, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Gregory v. Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969).

[3]

The Capitol of the United States, a national historical shrine and the political centerpiece of the Republic, is in the latter category. It may not be declared off limits to the people. Indeed, the Congress invites and welcomes the public.

In view of the broad and general invitation extended to the citizenry to this preeminently public building and the surrounding grounds, individual citizens could not be held to be "without lawful authority to remain . . . thereon", within the meaning of the unlawful entry statute, in the absence of some other, specific bar to their presence.

That bar could not, legally, be an order by the Chief of the Capitol Police issued on his own authority. Chief Powell would have the power to order someone ejected from the Capitol Grounds by virtue merely of his official position only if he had the same kind of proprietary interest in and control over the United States Capitol that an ordinary householder has with respect to his own home—which clearly he does not. See *Hague v. C.I.O., supra,* 307 U.S. at 514 [59 S.Ct. 954]. He can order the ejection only of those who have no legal right to be there.

In other words, the order to these defendants to leave was valid only if it was based on something other than and additional to the unlawful entry statute itself or the Chief's official status. And the only other source of authority cited by the prosecution is the Capitol Grounds statute, D.C.Code §§ 9–118 to 9–132.[3] Thus, it is the meaning and the validity of the Capitol Grounds

[4]

statute which are really at issue here—the unlawful entry law adds nothing.[4]

II

Defendants argue that the statute is vague and for that reason unconstitutional. *Cox v. Louisiana, supra; Wright v. Georgia,* 373 U.S. 284, 292, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963); *Lanzetta v. New Jersey,* 306 U.S. 451 (1939); *Connally v. General Construction Corp.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

D.C.Code § 9–124 forbids anyone to "parade, stand, or move in processions or assemblages . . . or to display . . . any flag, banner, or device designed or adapted to bring into public notice any party, organization or movement" except as permitted by the Speaker of the House and the President of the Senate for "occasions of national interest becoming the cognizance and entertainment of Congress" (D.C. Code § 9–128).[5]

---

**3.** That statute can also be found in 40 U.S.C. § 193.

**4.** Chief Powell testified that no one is arrested under the unlawful entry law who has a permit issued pursuant to the Capitol Grounds statute, and that "identical" standards are applied under the two laws in determining whether a violation occurred.

**5.** The power to suspend the statutory prohibitions devolves upon other officials in the absence of the Speaker and the President of the Senate.

The statute (particularly section 128) is sufficiently broad as interpreted by those charged with its enforcement [6] to lend itself to selective application. Moreover,

[5]

the standards actually employed have been imprecise, fluctuating, and unavailable to the public.

Chief Powell, who enforces the Capitol Grounds statute, was questioned at some length concerning his understanding of the standards governing that enforcement. He testified that there are no written rules; permits likewise are usually not in writing; members of the public have no way of knowing whether they might be in violation of the law or how to avoid violations except by prior experience or by inquiries to Members of Congress or members of the Capitol Police Force; [7] the rules applicable to the grounds are not identical to those applicable to the steps, and those which govern the use of some steps differ from those applicable to other steps; no assemblages for any purpose are allowed on the steps without a permit, but high school students and other undefined groups sometimes do not need a permit if they assemble on the steps for photographs which are taken more or less "spontaneously" or within fifteen minutes or so; such groups are allowed to meet in uniform, but not the American Nazi Party, and possibly, or possibly not, the American Legion; banners and flags may not be deployed, but a "non-political organization which had no pro or con" might be permitted to display banners; a relatively small group talking on the steps for approximately half an hour might or might not be in violation if its members refused to obey an order to leave; and decisions are made on a case-by-case basis rather than according to precise general rules.

[6]

The internal inconsistencies revealed by Chief Powell's testimony are further complicated by the fact that others in a position to know contradicted some of his assertions.

Chief Powell stated that permits are required regardless of the size of the group; Sergeant Schaap of the Capitol Police Force testified (in another proceeding) that groups of as many as ten persons may assemble without a permit; members of the Poor Peoples Campaign were allowed on the grounds in groups of twenty; press reports indicate that demonstrators in large numbers supporting Representative Adam Clayton Powell were permitted on the steps because Chief Powell had "orders to permit the demonstration;" and on the occasion of an earlier Quaker arrest, four other fairly sizeable groups were permitted freely to gather in the vicinity.

Chief Powell maintained that Members of Congress require permits for group gatherings on the Capitol steps like everyone else. But Representatives George E. Brown and Edward I. Koch both testified that permits are not required on such occasions; that "innumerable" such groups are invited [8] by Members of Congress to the steps; that by custom "it has never been required that one ask permission to do this;" and that these

---

**6.** These officials (presumably in reliance on the "becoming the . . . Congress" clause) have construed the exception contained in section 128 as authorizing them to issue permits for a great many relatively pedestrian assemblages, such as the taking of photographs on the Capitol steps. The Attorney General, on the other hand, has interpreted the same provision as justifying the grant of permits only for "such official ceremonies as the quadrennial inauguration of the President in front of the Capitol." Brief of the Department of Justice in No. 21566, *Jeannette Rankin Brigade v. Chief of Capitol Police* (D.C.Cir.) p. 27.

**7.** But, as appears *infra,* at least some Members of Congress and some Capitol Police officers differ with Chief Powell as to the correct procedure and the proper standard, and they may also differ with each other.

**8.** Defendants suggest that as guest of one or more Members of Congress they were not subject to prosecution under the statute. The Court is not prepared to find that the waiver power granted to the Speaker and the Vice President by section 128 has been delegated by custom and practice to individual Members, particularly when, as here, the Speaker was requested, but refused, to grant a waiver.

activities take place constantly at the sole discretion and on the

[7]

sole authority of the Congressman involved.[9]

The vagueness of the administrative practice and the selectivity with which it is applied may also be illustrated by the fact that, when these defendants were arrested, the Congressmen who were with them and who participated in the same conduct, were not (although they specifically waived any congressional immunity).

The conclusion is inescapable that, as the law is administered, it is impossible for anyone to know whether his presence, or the presence of his group, on Capitol Hill is lawful or unlawful. There is no set of regulations, orders, rules, or standards which he can consult, and the precedents of administration themselves are contradictory and uncertain.

Chief Powell's suggested remedy—that a member of the Capitol Police Force be asked for advice—does not solve the problem, for two reasons. First, the evidence is that no set of standards exists that is followed by all members of that Force. Second, and more fundamentally, in a government of laws, the regulation of conduct—particularly conduct in the sensitive area covered by the First Amendment— must be predicated on a set of definite rules, not on the opinions of police officers. Cf. *Cox v. Louisiana, supra,* 379 U.S. at 552, [85 S.Ct. 843].

[8]

Broad laws can be given structure by consistent patterns of administration. But the enforcement of this law, as revealed by this record, has done nothing more than to add to its uncertain substance the grains of individualized decision-making—a process which has failed to provide it with constitutional strength. Compare *Staub v. City of Baxley,* 355 U.S. 313, 322, [78 S.Ct. 277, 2 L.Ed.2d 302] (1958).

It remains to be determined whether statutory construction can give more definitive shape to this law and thus save it from invalidity.[10] Cf. *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).[11]

The evidence, the arguments, and the background materials indicate that three lines of construction are conceivable, two indicated by the predominant patterns of administration, the other by several indicia of congressional history and understanding.

III

Leaving to one side the aberrations and ambiguities, Chief Powell's testimony suggests that, insofar as enforcement of the Capitol Grounds statute is concerned, groups of persons are classified generally into three broad categories. The first is comprised of school children and some others who are permitted to gather for such activities as the taking of "spontaneous" photographs with their congressional representatives without the

---

9. The version of the two Congressmen is supported by other evidence. A number of photographs showing large groups of persons on the Capitol steps were introduced. It also appears that, on at least one occasion, when a Capitol Police officer was about to order a group away, he desisted when he learned that a Member of Congress was with them. And a letter from Representative Michael J. Kirwan, chairman of the Democratic National Congressional Committee, advised all Democratic Congressmen *that an official photographer would be available on the Capitol steps for four hours daily for photographing Members with groups of constituents.*

10. Thus far, there has been no significant court construction of the Capitol Grounds statute. See *Jeannette Rankin Brigade v. Chief of Capitol Police,* 278 F.Supp. 233 (D.C.D.C.1968). See also, the testimony of United States Attorney David Bress before the Senate Subcommittee on Public Buildings and Grounds, *infra* note 19 (Hearings, p. 8). Thus, the present interpretation is being written on a relatively clean slate insofar as judicial construction is concerned, and there is no impediment to a construction which will save the statute.

11. " . . . we are of the view that if [the statute] is confined more narrowly than the lower courts confined it, it can be preserved . . .." (325 U.S. at 100, 65 S.Ct. at 1035).

[9]

necessity for a waiver or permit. The second category consists of groups which are "noncontroversial and non-political." Upon request, these groups are given a waiver by the Speaker, the President of the Senate, or both, permitting them to assemble on the Capitol Grounds. Those who are deemed to be controversial or political are in the third category and are refused a waiver, no matter how small the group [12] or how well behaved its members.

The standard of noncontroversiality [13] is impossible of even-handed, impartial, and constitutional application.

What one person may consider well settled and beyond debate may be highly controversial to another. Even students— whom Chief Powell considered the least controversial of all—are scarcely always that, in this age of college and high school demonstrations and confrontations. With controversiality as the yardstick, who would and who would not be permitted to assemble on Capitol Hill—an organization of student radicals; an equal number of middle-of-the-road fraternity men; or an organization of militant young conservatives? Is a group advocating segregation more controversial or less so than one preaching integrated housing? [14] Is an organization

[10]

protesting the Vietnam conflict more or less controversial than another supporting the war?

The answers obviously depend upon the point of view of the person making the determination.

But under our constitutional system, no public official—executive, legislative, or ju-

dicial—can have the power to permit or to prohibit assembly on property belonging to the people based on his notions of what stand on public issues may be controversial. In the first place, the concept of controversiality is simply not sufficiently tangible to serve as a solid basis for this kind of decision. Beyond that, lack of controversy is too easily equated with orthodoxy, and controversy with dissent. Yet the controversial is as entitled to be heard as the indisputable, and it may need a hearing far more. In short, for several reasons the controversiality standard employed by Chief Powell is not compatible with constitutional values and principles.

## IV

The government suggests, alternatively, that it may be that the distinctions which are being made in the administration of the Capitol Grounds law have their roots not in the political coloration of the particular groups but in the type of activity they engage in while at the Capitol. If they come as tourists or visitors, it is said, they are permitted to gather; if they come to engage in persuasion by speech or sign or assembly, their presence is prohibited. This, the prosecution argues, is a perfectly proper and constitutionally unobjectionable practice. But this restatement of the permit policy amounts to but another way of saying that the Capitol

[11]

Grounds are open to all except those who seek to use them for the exercise of First Amendment rights. That, however, is a constitutionally impermissible standard, not only under the First Amendment but also

12. Chief Powell testified that in the instant situation—of Quakers reading the names of war dead from the Congressional Record—he would have issued an order to leave even if only a single person, rather than a group, had been involved.

13. Although Chief Powell used this term in his testimony to delineate the various classes, he

candidly acknowledged that "I'm not sure just what the expression 'noncontroversial' is."

14. According to the evidence, at least one recent group gathering on the Capitol Grounds included someone with an NAACP insignia. Also, as noted *supra,* p. 6, members of the Poor Peoples Campaign were allowed on the Grounds in assemblages.

under the due process clause of the Fifth Amendment.[15]

Absent compelling circumstances, members of the public may not be excluded from public areas because of their purpose to use these areas for the exercise of First Amendment rights. *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); *Food Employees v. Logan,* 391 U.S. 308, 315, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); *Kunz v. New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 267 (1951); cf. *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). For the streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thought between citizens, and discussing public questions." That use may be regulated "but it must not, in the guise of regulation, be abridged or denied." *Hague v. C.I.O., supra,* 307 U.S. at 515, 59 S.Ct. at 964. For these reasons, and because First Amendment rights occupy a "preferred position" (*Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948)), the burden is on the government to establish the existence of compelling circumstances, justifying a restriction. *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

[12]

A legislative body particularly could not permit access to it of only the innocuous, for peaceful, reasoned controversy and debate are the very lifeblood of the democratic process.

In this day of the violent confrontation, the harsh, non-negotiable demand, the dis-

regard of the most elementary forms of civilized discourse, it is especially important that peaceful speech and courteous persuasion be given their rightful chance. It would be strange, indeed, if our constitutional system, and especially the First Amendment, were to countenance the congregation on the grounds occupied by the national legislature of all manner of groups except those who wish to speak out peacefully on the controversial issues of the day. That is not the mark set by the Bill of Rights.

It is presumably for that reason that Mr. Justice Stewart, speaking for a near-unanimous Supreme Court, held in the controlling case of *Edwards v. South Carolina.* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), that non-violent demonstrations on the grounds of the South Carolina State Capitol were constitutionally protected from interference,[16] and reversed breaches of the peace convictions of 187 Negroes protesting there against alleged discrimination.

Lest there be any question about what was meant in *Edwards,* the Court removed that doubt three years later in *Adderly v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). In that case, in upholding a conviction for assembling not far from a jail, the Supreme Court drew a sharp distinction between such a meeting and one held close to a structure housing

[13]

a legislative body. Said the Court (385 U.S. at 41, 87 S.Ct. at 244): "In *Edwards,* the demonstrators went to the South Carolina State Capitol Grounds to protest. In this case they went to the jail. Traditionally, state capitol grounds are open to the public. Jails, built for security purposes, are not."

---

**15.** Unjustifiable discrimination is prohibited by the due process clause. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Shapiro v. Thompson,* [394] U.S. [618] [89 S.Ct. 1322, 22 L.Ed.2d 600] (1969).

**16.** The Department of Justice appears to agree with this interpretation of *Edwards.* In its brief in *Rankin* (see *supra,* note 6) the Depart-

ment interprets the teaching of *Edwards* to be "that the peaceful petition by non-obstructive small groups may not be abridged by being denominated a breach of the peace" (Br., p. 2). It follows that peaceful petition by non-obstructive small groups may not be abridged by being denominated an unlawful entry.

*Edwards* could be distinguished from the instant situation only on the theory that there is a First Amendment right to speak, assemble, and petition near State legislative buildings but no right to do so near the buildings occupied by the Congress of the United States. Not only is there no warrant in either logic or history for such a distinction, but to make it would turn upside down both the constitutional and the practical realities.

The First Amendment which protects the rights to free speech, assembly, and petition, is addressed primarily to the Congress, and only by implication has it been applied also, by way of the Fourteenth Amendment, to the States. Moreover, in this day of great federal power and influence, the right to petition is, if anything, more important in relation to the federal authorities than it is in relation to the governing bodies of the individual States. In short, *Edwards* applies here *a fortiori*.

For these reasons, the statute could not constitutionally be applied to enforce a policy of keeping off the Capitol Grounds groups of persons merely because they are controversial in character or because they seek to exercise First Amendment rights.[17]

[14]

V

The other possible line of construction of the law rests on legislative history and statutory development. It is not solidly grounded in administrative practice or actual use, yet, for reasons which will be developed below, it is the one to be followed.

The original purpose of section 124, when enacted in 1882, was not to bar all controversial groups or to keep from the Capitol Grounds all except tourists and visitors, but only "to prevent the occurrence near [the Capitol] of such disturbances as are incident to the orderly use of public streets and places." 22 Stat. 126.

Recent amendments to the companion section 123 and their legislative history indicate that the congressional view concerning the scope of regulations of conduct on the Capitol Grounds has not significantly changed since 1882.

Section 123 was amended in 1967 to establish a number of specific and carefully circumscribed prohibitions with respect to activities in the Capitol Buildings and on the Capitol Grounds.[18]

In the course of committee consideration of the bill [19] which, with some modifications, became the present section 123, Senator Jordan chairman of the subcommittee conducting the hearings, made quite clear at the very outset

[15]

that what was intended was to provide adequate safeguards "to insure that Congress can transact its business and perform its constitutional functions in an orderly manner, without interference," and at the same time "to guarantee that there is no infringement on the rights of the people . . . to assemble peaceably and to petition the Government for a redress of grievances" (Hearings, p. 1).

Senator Tydings similarly drew attention to these dual purposes, stating that what

---

**17.** *Feeley v. District of Columbia*, 220 A.2d 325 (D.C.App.1966) is not to the contrary. The court's conclusion there that the appellants had no right to be present where they were arrested was predicated on a record which did not demonstrate—as the record here does—that other groups were using the Capitol Grounds. Beyond that, the *Feeley* court's comments concerning section 124 were dictum (see *Jeannette Rankin Brigade v. Chief of Capitol Police*, note 10, *supra* (278 F.Supp. at 234–35)) and its decision was later reversed. 128 U.S.App.D.C. 258, 387 F.2d 216 (1967).

**18.** If section 124 were as broad in its sweep as the prosecution here believes it is, many of the 1967 amendments would have been unnecessary and superfluous. Indeed, one of the new provisions forbids anyone to "parade, demonstrate, or picket *within* any of the Capitol Buildings" (section 123(b)(7)) (emphasis added), but it is silent with respect to the Grounds.

**19.** Hearings before the Subcommittee on Public Buildings and Grounds of the Senate Committee on Public Works on S. 2310, 90th Cong., 1st Sess. (September 21, 1967).

was needed was language "which would protect the reasonable right of peaceful picketing or demonstration, but which at the same time would give power to promulgate reasonable regulations" so as to prevent violations of the criminal provisions and to protect the orderly functions of the legislative branch (Hearings, p. 19).[20]

It must be borne in mind, too, that while the enforcement practices of the statute have been described in terms of the controversial-noncontroversial dichotomy, underlying at least some of those practices was the desire to assure the security of the Congress from interference and disturbance, in line with the original purpose of the statute and the reason for the 1967 amendments. Finally, it may be noted that the District of Columbia Court of Appeals recently concluded (*Feeley v. District of Columbia, supra,* note 17) that the Capitol Grounds

[16]

statute was designed to guarantee noninterference with the work of the legislature, the maintenance of the free and undisturbed movement of tourists and visitors, and the protection of the landscape.

While, of course, these bits of legislative and administrative purpose do not compare in volume with the longstanding, though somewhat confused, administrative practice, they should nevertheless be given controlling weight, in view of the paramount rule of statutory construction that it is the duty of the Court to adopt a construction, if it is possible to do so, which will save the statute from unconstitutionality, rather than one which would result in its destruction. *Lynch v. Overholser,* 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); *Rescue Army v. Municipal Court,* 331 U.S. 549, 568–575, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); *Ashwander v. T.V.A.,* 297 U.S. 288,

345, 56 S.Ct. 466, 80 L.Ed. 688 (1936); *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *United States v. Harriss,* 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *Screws v. United States,* 325 U.S. 91, 100, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *Schneider v. Smith,* 390 U.S. 17, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968); *Bolton v. Harris,* 130 U.S.App.D.C. 1, 395 F.2d 642 (D.C.Cir.1968).

Adherence to this rule is particularly important in the present context. Too many legislative bodies, from the Senate in ancient Rome to the French Chamber of Deputies in modern times, have been pressured and intimidated by groups hostile to democratic forms of government for anyone to be oblivious of the danger that such potential intimidation presents. For that reason, special care must be exercised not to read the law so as to leave a vacuum,[21] if it is at all possible to do so.

[17]

VI

I conclude that the legislative and other materials discussed under V *supra* provide a sufficient basis for restricting the scope of section 124 to the imposition of criminal punishment for acts or conduct which interferes with the orderly processes of the Congress, or with the safety of individual legislators, staff members, visitors, or tourists, or their right to be free from intimidation, undue pressure, noise, or inconvenience. As so limited, the statute is constitutional.

It is appropriate, therefore, under the statute, to bar or to order from the Capitol Grounds, any group which is noisy, violent, armed, or disorderly in behavior; any group which has a purpose to interfere with the processes of the Congress, any Member of Congress, congressional employee, visitor, or tourist; any group which has the effect,

---

**20.** The Senate Committee Report on the 1967 amendments likewise emphasized the necessity for the maintenance of safety and order and the need to prevent "acts designed to impede, disrupt, or disturb the orderly conduct of the Nation's business" (S.Rep.No.578, 90th Cong., 1st Sess., p. 7).

**21.** As the discussion above indicates, the Capitol Grounds statute can be saved from total invalidity only if it is interpreted narrowly, consistently with its original purposes.

by its presence, of interfering with the processes of the Congress, any Member of Congress, congressional employee, visitor, or tourist; and any group which damages any part of the buildings, shrubbery, or plant life.[22]

Accordingly, the prosecution will be permitted to proceed by way, first, of an opening statement if it wishes to do so. If that opening statement outlines evidence which prima facie would justify a conviction based on the standards here laid down, the trial will go forward. If the government concludes that it is unable to make an opening statement outlining acts which would

[18]

constitute an offense under the statute as interpreted herein, or if the Court should conclude after hearing the opening statement that no offense has been stated, the charges will be dismissed.[23]

/s/ Harold H. Greene
Chief Judge

June 19, 1969

LEVENTHAL, Circuit Judge, concurring:

I concur in the judgment of the court, and concur generally in the opinion written by Judge Wright. I undertake in this opinion to focus on what I view as the critical issues and aspects of the case.

I

In defending this action grounded in unlawful arrest and detention, Chief Powell, chief of the United States Capitol Police, claims entitlement to a directed verdict on the grounds of a qualified official immunity. That immunity depends upon "the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief. . . ." *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692 (1974). Chief Powell claims that he had a reasonable good faith belief that plaintiffs were in violation of the Capitol Grounds statute, 9 D.C.Code § 124 (1973), and that he was therefore privileged to arrest them.

A.

The elements of the offense with which the Capitol Grounds statute is concerned are set out in Judge Greene's opinion in *United States v. Nicholson,*[1] an opinion with which Chief Powell was thoroughly familiar. In order to protect against arbitrary interference with First Amendment rights, Judge Greene held that the broad language of the statute would have to be subjected to a limiting construction, so that the Capitol Police could "bar or order from" the Capitol Grounds only those groups which were "noisy, violent, armed, or disorderly in behavior"; which had the purpose or effect of interfering with the processes of the Congress, any Member of Congress, congressional employee, visitor or tourist; or which damaged any part of the buildings or plantings. In each category, Judge Greene noted, "the conduct would have to be more disruptive or substantial (in degree or number) than that normally engaged in by tourists and others and routinely permitted on the Grounds." Slip. Op. at 17 n. 22. In addition, as Judge Wright's opinion more fully explains, both law and basic fairness dictated that before persons previously permitted to assemble on the Capitol Grounds

---

**22.** In each category, the conduct would have to be more disruptive or more substantial (in degree or number) than that normally engaged in by tourists and others and routinely permitted on the Grounds.

**23.** The Court's construction of the present statute is, of course, without prejudice to congressional adoption of more specific standards, such as, for example, those suggested by United States Attorney David Bress during the 1967 hearings (to require permits; specify the times, locations, size, and character of parades, assemblies, picketing activities, and demonstrations; prescribe limitations on the display of signs, banners, flags, or other symbols; and prohibit or limit the use of sound amplifying devices or conduct which may be disruptive of the legislative process or disturbing to the peace and the unique character of the area).

**1.** Nos. 20210–69A et al. (D.C.Ct. of Gen.Sess. June 19, 1969), *aff'd,* 263 A.2d 56 (D.C.App. 1970).

could be arrested for violation of the statute, they must be notified through a dispersal order that their permission to assemble has been revoked. *See Cox v. Louisiana,* 379 U.S. 559, 568 ff., 85 S.Ct. 453 (1965).

The question as to whether Chief Powell had a reasonable good faith belief that he had complied with these requirements was fully explored at trial. Plaintiffs presented testimony tending to show that theirs was a reasonably orderly meeting, not disruptive of the affairs of Congress. Plaintiffs' witnesses testified that plaintiffs had assembled on the Mall and proceeded along the sidewalk to the Capitol, stopping at red lights. When the group was halted by Inspector Xander of the Capitol Police, Congressmen Dellums and Mitchell and Congresswoman Abzug informed him that they had invited the group to meet with them on the House steps, and Xander said "no problem". Witnesses testified that as the Congressmen spoke to the group, the group listened, cheered and applauded. An Assistant U. S. Attorney testified that there was no violence at any time during the afternoon. Metropolitan Police Captain Albert Ferguson remembered it as "a fairly mild demonstration" (Tr. 3480, App. 1846) and Chief Wilson, Chief of the District of Columbia Metropolitan Police Department, a defendant in this action, admitted that apart from the fact that the plaintiffs were blocking the steps of the Capitol, "it was a reasonably orderly crowd." (Tr. 1589, App. 962). "There were some speeches going on and a few particular misbehaviors" he said, "but generally it was not a bad crowd."[2] *Id.*

At approximately 3:15 or 3:20 p. m., Chief Powell gave and repeated over his bullhorn an order to disperse. Plaintiffs' witnesses testified that although in some cases they saw Chief Powell hold up his bullhorn, they did not hear what he said. (The demonstra-

tors were also using sound equipment to address the crowd.) A reporter testified that Chief Powell, after making his initial announcements, had turned to Chief Wilson and said that he thought many people had not heard the order to leave, and asked Wilson if he thought the order should be given again. "No," Wilson said, "let them tell their story in court". (Tr. 820, App. 645). The arrests began at 3:26 p. m., while Congressman Dellums was speaking. On the basis of this and much other evidence about the way the arrests were conducted, the plaintiffs argued to the jury that the crowd was a reasonably orderly one, and that Chief Powell lacked a reasonable good faith belief that the group was in violation of law.

Chief Powell, for his part, was given a full opportunity to show that the group was a disruptive one and that he had acted reasonably and in good faith. Defendants' witnesses testified that during that period prior to the congressional addresses the group engaged in loud chanting, singing and shouting. There was also testimony that some members of the group pounded on Capitol doors and windows, painted on the Capitol walls and climbed on Capitol lamp posts. One member of the group disrobed; others waived Viet Cong flags.

Chief Powell testified that he attempted to warn the demonstrators on several occasions that they would be arrested if they did not disperse, but that when he addressed the crowd, the level of noise increased so as to drown him out. (Tr. 1952, 1959, App. 1176, 1182.) One arrested named plaintiff admitted that he had heard the announcement (Tr. 617, App. 457), and a policeman testified that, in his view, the demonstrators had no intention of leaving the steps, even if they had heard the announcements. (Tr. 3539, App. 1895).

---

2. The House Ways and Means Committee was meeting just inside the steps where the group was located. The Minority Counsel for that Committee, who was called to the stand by the defendants, said that the noise from the crowd amounted to "a steady hum" and that the chants were "a little louder." (Tr. 2162, App.

1348). He testified that the Committee was able to complete its business without interruption or suspension, and that it was "not uncommon" for the Committee to hear noise constituting a "problem" from tourists milling about in the corridors. (Tr. 2172–73, App. 1358–59).

In sum, both sides had an opportunity to present evidence concerning the behavior of the demonstrators, the effect on the Congress, and the actions of the police. The trial lasted six and one half weeks. The court and jury heard testimony from a total of seventy four witnesses, of whom twenty nine were called by defendants. A total of 190 documentary exhibits were introduced, including pictures of the demonstration.[3]

The case was submitted to the jury with very extensive instructions on the issue of immunity. The jury was told that under the *Nicholson* case the authorities could order from the Capitol Grounds:

> any group as a whole which was more noisy violent or disorderly in behavior than is normally permitted on the Capitol grounds. Any group which had a purpose to interfere with the process of Congress, any member of Congress, congressional employees, visitors or tourists. Any group which had the effect by its presence of interfering with the processes of Congress or any member thereof, or any employee or visitor. Any group which damages any part of the building, shrubbery or plant life. The behavior must be such that the group can be characterized as a whole. If only one person, or even if several persons who might be easily identifiable participate in an unlawful behavior, this will not justify characterizing a group as a group to be dispersed.

The jury was then instructed that "if Chief Powell in good faith and reasonably believed that the group on the Capitol steps could properly be characterized as one of the groups described in the *Nicholson* case, then Chief Powell was justified in ordering their dispersal." Chief Powell was entitled to rely on "traditional sources of information" and the jury's determination as to whether he acted reasonably was "not to be based on hindsight, but rather on the facts and circumstances and the information available to Powell at the time he gave the

order." "In the context of this case" the defendants were also required to prove that demonstrators "were in fact ordered off" the property, and that they were given a "choice of getting off or staying on and being arrested" and that they "ignored the order knowingly".

Guided by these and other instructions, the jury deliberated for more than a day. The substantial verdict they returned in favor of the plaintiffs clearly shows that the jury credited the plaintiffs' characterization of the events in question.

In view of the very full exploration of these events at trial, the direct clash of the evidence, and the fair and complete instructions to the jury on this issue, I can see no principled basis for overturning the jury's verdict on this issue of official immunity. It is quintessentially the function of the jury to assess credibility and resolve complex factual disputes. It is also a traditional function of the jury to make judgments as to the reasonableness of an actor's conduct. Here the jury was asked to do both, and we must respect its decision, both insofar as it determines the facts of what took place and the issues of reasonableness of conduct of both plaintiffs and defendants.

Of course, if a jury's verdict reaches beyond the evidence, or reaches a result with which no reasonable man could concur, judicial intervention would be justified. But that is clearly not this case. Plaintiffs were able to introduce voluminous evidence in support of their points that the demonstrators were orderly and that the warnings were not heard. Even one of the defendants commented that this was "not a bad crowd". In this posture, the jury verdict for plaintiffs must be sustained.

### B.

Similarly, Chief Powell cannot insist on a directed verdict on the ground of good faith reliance on advice of counsel. As Judge

---

**3.** A police film of the demonstration was produced by the government at the 1971 criminal trial of the demonstrators. Although it was subpoenaed by the plaintiffs for use in this trial, it was not produced. Inspector Robert Krohling of the Capitol Police Department testified that he understood that it had been destroyed. (Tr. 3573, App. 1929).

Bryant's jury instructions made clear, that defense depends upon complete disclosure of all material facts to the advising attorney. Here plaintiffs presented testimony that although Chief Powell had been instructed by the Speaker of the House not to arrest the demonstrators as long as they were being addressed by members of Congress, (Tr. 2555–56, App. 1563–64) Powell had not communicated that fact to the attorney on whose advice he now claims to be relying. (Tr. 3904, App. 2045). Powell argues that the Speaker's orders permitted arrests if the group was not orderly, and that, in any event, those orders arrived after Powell had consulted with the assistant district attorney. But the factual question of what was said and the value judgment as to whether the sequence of events excused Powell's nondisclosure were not for the court to decide, but necessarily questions for the jury.

## II

I do find deficiencies in the instructions on damages. The jury returned verdicts for plaintiffs for monetary damages totalling an estimated $12,000,000. Of this, the largest item was an award of $7,500 to each class member and to Congressman Dellums for violation of first amendment rights. The jury also awarded $500 to each class member for cruel and unusual punishment, and $50 to each class member for malicious prosecution.[4] Lastly, the jury awarded damages for false arrest and false imprisonment on a variable scale: for 12 hours or less in detention, $120; for 12 to 24 hours in detention, $360; for 24 to 48 hours of detention, $960; and for 48 to 72 hours of detention, $1,800.

### A.

Defendants do not challenge the scale on which damages for false arrest and imprisonment were awarded. The jury was instructed that, "In determining damages for false imprisonment, you may consider both the length of time the plaintiffs were held and the treatment and conditions of detention to which they were subjected, if they were in fact falsely imprisoned." App. 2303. Working with the Form of Verdict designed by the district court, the jury was able to award damages along a sliding scale which took into account, in a rough way, the different experiences of different members of the class, without losing administrative feasibility.

### B.

The jury instructions with respect to cruel and unusual punishment were not so well designed. In the first place, they permitted damages duplicative of those awarded for false arrest and imprisonment. The jury was entitled to consider "whether the persons . . . in charge used excessive and unnecessary physical force in dealing with them, whether or not they were furnished adequate nourishment, whether or not they were furnished with adequate shelter under reasonable conditions, bedding and toilet facilities." App. 2308. The jury was also instructed to consider "the purpose for which (the plaintiffs) were detained" and "the length of time during which these persons were subjected to these conditions" in assessing damages for the violation. *Id.* While these instructions might have been reasonable in the circumstances of another case, here, where the plaintiffs had already received damages for "length of confinement and conditions of detention" under their claim for false arrest, I do not think that these instructions focused adequately on the "unusual" aspects of plaintiffs confinement.

A second reason why the $500 per plaintiff award cannot stand is that individual plaintiffs were confined under greatly differing conditions. As is clear from the awards for false imprisonment, some members of the class were detained for substantially less time than others. One-half of the class was not taken to the D.C. cell block,

---

4. The eight persons who were defendants in the 1971 criminal trial received an additional $3,000 apiece. Because the court vacates the awards for malicious prosecution on substantive grounds, I do not discuss the damage aspects.

where conditions were apparently most inhumane. It appears that even among those imprisoned at the same location, there may have been significant differences in terms of food and bedding supplied, medical attention, use of physical force, etc. Under these circumstances, a uniform award was inappropriate.

### C.

I turn finally to the verdict of $7,500 per person for infringement of first amendment rights. Ultimately the first amendment rights of free speech and free assembly are priceless. But a price must be put on them in the context of civil litigation. That verdict must be as reasonable and guided as any other. An award for violation of a first amendment right must be commensurate with the value to the plaintiff of the right that has been lost. The jury must take into account the extent to which the plaintiffs were actually impeded in imparting and receiving messages. If a speaker was able to exercise his rights, but was somewhat confined in the manner or length of time for presenting his views, then an award is still possible, but it cannot be as much as if he were entirely frustrated from expression. Every action for damages has some potential for deterrence, but in the absence of special circumstances calling for exemplary damages, the amount of the award should be based on compensation, not punishment or deterrence.

Although the fact that damages are being sought on behalf of a large class does not mean that each member of the class should receive less than his due, it is a reason for care in the formulation of instructions. In cases of this type, a distortion in the size of the award to the individual plaintiff may be magnified thousandfold. There is therefore a special need to develop precise instructions on the damages issue, and a special obligation to undertake close scrutiny upon appellate review.

From this perspective, the instructions given to the jury in this case provided inadequate guidance. The jury was simply told "to apply its judgment and experience in determining fair compensation for the loss of such rights, taking into consideration all the facts and circumstances surrounding the violation." App. 2347. This open-ended instruction did not inform the jury that it had an obligation to be reasonable in its award; and that its verdict should reflect the value to the plaintiffs of the lost opportunity for assembly and expression. The jury was not told to take into account the extent to which plaintiffs did get their message delivered through the totality of incidents, including the speeches, signs and demonstrations effected prior to the police intervention, and the media coverage of such incidents.

In addition, the vagueness of the instruction left room for the jury to consider improper factors. The size of the $7,500 verdict [5]—particularly taking into account that there was separate compensation for unlawful arrest and detention—suggests that there may have been an element of punitive damages in the jury's award. There was no prayer for punitive damages. However, because the district court's instruction set no limits on the jury's discretion (and no separate instruction on the availability of exemplary damages was given), the jury may have assumed that its authority included the possibility of punitive damages. In the circumstances of this case, involving a large class and an otherwise broad instruction on damages for first amendment violation, the district court should have taken explicit steps to avert a punitive element in the damage award.[6]

Also disturbing is the possibility that the jury might have included damages for mental distress and suffering. I recognize that an individual plaintiff suing for violation of first amendment rights is not limited to out-of-pocket expenses but may, upon a proper showing, recover for emotional

---

5. *See, e. g., Manfredonia v. Barry,* 401 F.Supp. 762, 770–72 (E.D.N.Y.1975) and cases cited therein.

6. Such an instruction was requested by Defendant Powell. Instruction No. 16, A. at 202.

harm. *Glasson v. City of Louisville,* 518 F.2d 899, 912 (6th Cir.) (McCree, J.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975); *Donovan v. Reinbold,* 433 F.2d 738, 743 (9th Cir. 1970). But in the context of a large class action, there is simply too much room for variation on this item among members of the class. Thus, while individual class members might be permitted to recover for emotional harm upon a proper showing, the uniform class award for first amendment damages cannot in all fairness encompass this. The class award must focus on the injury sustained by all members of the class—the value that each one of them would necessarily place on the rights of free expression and assembly in the circumstances of this case. The class award for fourth amendment damages included an element for humiliation of arrest and detention,[7] which may be deemed inescapable for any false detention. Beyond this, however, the award to all members of the class as a class cannot go. In sum, class-wide damages must be those which necessarily arise from events which made this action appropriate for class treatment in the first place: the decision that the group as a whole should be arrested; the uniform booking procedures; and the assumption all the demonstrators were essentially in the same position, an assumption confirmed by the United States Attorney in advising class counsel that he could pick any eight individuals to use as test case defendants in the criminal prosecution.

Because the district court failed to provide the jury with any criteria defining the proper scope of the monetary recovery for first amendment infringement, I think that this part of the judgment must be vacated. I see wisdom, however, in Judge Wright's suggestion that the parties consider whether this issue might most appropriately be handled on remand by the trial judge.

### CONCLUSION

During the six weeks of trial, the jury heard two conflicting versions of the events which precipitated the arrests and subsequent confinement. In the eyes of the police, the assembly on the Capitol steps was part of a concerted effort by the organizers of May Week to disrupt the operations of the federal government and intimidate the Congress. Chief Powell viewed the demonstration as "a disorderly, hostile and violent crowd" and argued that his concern for the safety of the Congress, as well as the noise of the crowd, justified his action. Plaintiffs portray the arrests as stemming from a concerted effort by law enforcement authorities to end dissent by arresting dissenters. Plaintiffs' witnesses testified that this was a nonviolent, reasonably orderly assembly seeking to present a petition and hear the addresses of several interested Congressmen.

The jury credited plaintiffs' characterization of the demonstration. Since reliance on the intelligence and fairness of the well-instructed jury is central to our system of justice, we respect the jury's resolution of these major factual issues.

The court sustains the jury's award of damages for false arrest and imprisonment in sums commensurate with the duration of imprisonment. In the belief, however, that the jury did not receive adequate guidance with respect to damages, it is appropriate to vacate those verdicts which were duplicative or excessive or which permitted uniform compensation for injuries not uniformly sustained throughout the class. The remand will confine damages to a determination of reasonable compensation for the interference with plaintiffs' first amendment rights.

\* \* \* \* \* \*

Receipt of the dissenting views of my esteemed brother Tamm prompts me to add a word. In part, he seems to say that the true facts, if they only had been effectively presented at trial, would have established a

---

7. *See Dellums v. Powell,* 184 U.S.App.D.C. —— at ——, 566 F.2d 216 at 227, decided this day (". . . the insult of false arrest, any subsequent humiliation or mistreatment, and the duration of loss of liberty.")

stronger case for defendants, and in his view a conclusive one. But trial and appellate courts alike must dispose of cases on the records before them. As Judge Wright points out, at n. 88, Chief Powell had ample opportunity to testify as to how his reactions to the demonstration of May 5 may have been affected by his awareness of the prior disturbances. There can be only a limited role for judicial notice as to complex and controversial events. It may be appropriate to refer to the record in another case before the same court. Thus the issues in *Apton*[8] made it useful to refer to the record in *Sullivan*,[9] even though that in turn was the kind of record appropriate for an interlocutory ruling. But neither of those records bring out the situation confronted by Chief Powell on May 5, 1971, which is the matter at hand. The defendants did not take the position that in view of the situation prior to May 5 it was unlawful for plaintiffs to hold any demonstration whatever on May 5 on Capitol Grounds. The question is, what was the nature of the demonstration that was held, and whether the police reaction to that demonstration was reasonable. Our prior opinions provide background that is not irrelevant. But this case must be decided on the record concerning May 5, the instructions to the jury and its verdict.

In conclusion, although I have put my approach in my own way, I do join Judge Wright in the fundamental conception that this was a case where a jury verdict, after more than a day of deliberation following a six week's trial, resolved the legal issues

presented by conflicting versions of the events, and conflicting views of the reasonableness of conduct of both defendants and plaintiffs. The remand of the damages determination reflects a proper judicial concern that the plaintiffs should receive full compensation for the impairment of their rights and their suffering, but not a windfall.

TAMM, Circuit Judge, dissenting.

I cannot concur in an opinion which is based upon a library analysis rather than the grim realities of the urban forum. In the ivory tower atmosphere of this courthouse my Brothers uphold an unfortunate jury verdict arrived at upon evidence of a single day's occurrence completely isolated from the violent and tragic events which immediately preceded it. To evaluate the motivation and liability of police conduct in the vacuum of a single event, with eyes closed to contemporaneous circumstances, is to create a legal bankruptcy.

The events enumerated with masochistic delight in the opinion for the court occurred on May 5, 1971. They represented, however, the climax of a series of demonstrations which began on April 18, 1971 and accelerated in size, volume and violence to the dimensions of a *Putsch* or rebellion.[1] I have attached as an appendix hereto a compilation of headlines and excerpts from the Washington Post for the period of April 21 to May 10, 1971. I list the following in order to highlight a few direct quotations as indicative of the conditions as they were

8. *Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83 (1974).

9. *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 478 F.2d 938, *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973).

1. The coordinators of the May Day group felt that they could not prevent the authorities from infiltrating their group and therefore any efforts to keep their plans secret would only serve to confuse the participants. J.A. 2463. As a result they published and distributed the May Day Tactical Manual. J.A. 2456–79. The Manual outlined the procedures to be followed

by the demonstrators and also contained a schedule of the demonstrations set for May Week. J.A. 2460. The climax of this anti-war effort was set for Wednesday, May 5, 1971. The outline called for all the people who had not been arrested on May 3 or 4 to move to the Capitol building to lay a nonviolent siege demanding that Congress ratify the Peoples' Peace Treaty and to remain there until the Treaty was ratified or all were arrested. J.A. 2460, 2464. The Manual made it quite clear that the singular objective of this effort was to close down the federal government. J.A. 2458, 2460.

from day-to-day observed, appraised and reported by media representatives:

| | |
|---|---|
| April 22 | Protestors Threaten Massive City Tie Up . . . Massive Civil Disobedience Designed To Halt Functioning Of Government Here. . . Leaders Distribute May Day Manual.[2] |
| April 23 | The danger is always present that violence will break out. It is a much greater danger in the upcoming demonstrations.[3] |
| April 24 | Police have handled 289 demonstrations in the last year.[4] |
| April 25 | End War Now, Throng Demands—Over 175,000 Rally At Capitol.[5] |
| April 26 | Protesters Shut N.J. Turnpike—10 Day Protest To Begin—Government Disruption Scheduled.[6] |
| April 27 | D.C. Guard To Train; Protestors Disrupt Hill.[7] |
| April 29 | Girl Arrested As Witness in Capitol Blast—200 Arrested, Bond Raised For Protestors.[8] |
| April 30 | Arrests Halt War March—224 Seized After Razing Wall at H.E.W.[9] |
| May 1 | Kidnap Plot Details Bared; More Indicted |
| | A federal grand jury issued a new indictment yesterday in the alleged conspiracy to kidnap Henry Kissinger and bomb government buildings.[10] |
| May 2 | Troops Move In To Area. Visitors Mass To Tie Up City; 50,000 In Park—Spirit Of Militancy Rises.[11] |
| | Lead Editorial |
| | It seems almost unnecessary to say that the army of anti-war demonstrators who hope to paralyze Washington tomorrow cannot be permitted to succeed.[12] |
| May 3 | Campers Ousted, Still Planning To Snarl City Today.[13] |
| May 4 | 7,000 Arrested Disrupting City, New Obstructions Threatened Today, Arrests Set U.S. Record For Single Day, Protestors Irk Citizens. |
| | * * * * |
| | More than 7,000 persons were arrested in widespread hit-and-run skirminshes with police and federal troops in Washington yesterday as anti-war protestors |

made an unprecedented attempt to bring the government to a physical halt.

Jails, Courts Overburdened.[14]

* * * *

Keeping The City Open Took 4,000 Troops Deployed And 4,000 In Reserve, 1400 D.C. National Guardsmen The Bulk Of the 5100 man D.C. Police Force And Park And Capitol Police.[15]

* * * *

Yesterday's picture of the City looked like this . . . an estimated 11,000 to 12,000 demonstrators swarming through much of downtown Washington in the early morning blocking streets and tangling with police.[16]

Lead Editorial

* * * *

But you cannot be much swayed by a movement when its message is obliterated by its medium—the smashing of cars, the blocking of streets, the scattering of garbage, the invitation to violence, the battling with police. That is the tragedy of the ongoing upheaval in the Capital, it is not so much a protest as a rampage and the message is not lost; it is violated so that the movement is the loser in the end

* * * *

The only possibility would seem to be that it will all get uglier as patience wears thin on the part of the weary and hard pressed police and on the part of private citizens.[17]

Such then was the unfortunate, but nevertheless alarming situation which existed on May 5, 1971. The demonstrations of the two previous days could hardly be characterized as peaceful assemblies to petition for redress of grievances. They were segments of an unprecedented, sophisticated and calculated effort to shut down the Capital city of the United States of America. The May 5, 1971, Washington Post headlined "Capitol Rally Set Today by Rem-

2. The Washington Post, April 22, 1971, § B at 1, col. 1.

3. Marquis Childs, Veterans Camp: What They Seek, The Washington Post, April 23, 1971, § A at 23, col. 7.

4. The Washington Post, April 24, 1971, § A at 8, col. 1.

5. *Id.,* April 25, 1971, § A at 1, col. 1.

6. *Id.,* April 26, 1971, § A at 1, col. 5.

7. *Id.,* April 27, 1971, § A at 1, col. 1.

8. *Id.,* April 29, 1971, § A at 1, col. 2, 7.

9. *Id.,* April 30, 1971, § A at 1, col. 1.

10. *Id.,* May 1, 1971, § A at 1, col. 7.

11. *Id.,* May 2, 1971, § A at 1, col. 1, 4.

12. *Id.,* § B at 6, col. 1.

13. *Id.,* May 3, 1971, § A at 1, col. 6.

14. *Id.,* May 4, 1971, § A at 1, col. 3, 5, 7.

15. *Id.,* col. 7.

16. *Id.*

17. *Id.,* at 16, col. 1.

nants." [18] Was it unreasonable for law enforcement officers to be apprehensive that these "remnants" of the mobs which had been smashing cars, blocking streets, scattering garbage and battling with police, whose leaders had been urging mass violations of the law and disruption of government functions; which had razed a wall at H.E.W. and blocked doors at the Justice Department; and which had apparently conspired to kidnap Henry Kissinger and bomb government buildings; might at any time erupt into another emotional cataclysm?

Violence undermines the order which is indispensable to liberty. The anti-war activities leading up to May 5, 1971 were designed to reduce the federal government to a shambles, to a mere tool of the violent. Certainly there was nothing in the events of the previous two weeks to inspire law enforcement officers with faith in man's inherent goodness, nor had they any reason to believe that they were confronted with a paradigmatic display of a peaceful exercise of first amendment rights. Media reports continually recorded that the demonstrators actions were guided less by law than by emotions and violence. It is then against this background that I believe the legal liability of the law enforcement officers should be evaluated. As Judge Leventhal so aptly points out in quoting from *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974), the qualified immunity of a government official depends upon "the existence of reasonable grounds for the belief formed at the time and in light of *all* the circumstances, coupled with a good faith belief . . . ." (Concurring opinion at 1) (Emphasis added).

My Brethren's instincts in protecting the civil rights of these appellees are sound, but I feel their prescriptions are fallacious. "All rights are derived from the purposes of the society in which they exist; above all rights rises duty to the community." [19] I too am bound to utilize every legal avenue to guard, protect and enforce the strict observance of every person's constitutional rights, but I also recognize that courts must deal with people. I cannot be blind to the realization that mankind learns to replace fancied fears with real dangers. Our judicial system exists basically for expressing the conscience of the nation.

As the tension created in part by the number of demonstrators mounted, the police officials, mindful of all that had gone before were bound to reach a *punctum tempo* — a point in time when they had to conclude that it was *aut tunc aut numquam* —now or never. An ancient scholar once asked *"Quis locus eligenuus vastatus an vastatus"*—what place shall I choose—one that is destroyed or one that is going to be destroyed? Obviously these officers, pledged to maintain law and order, could not eschew action until the crisis exploded. The time had arrived when feckless tolerance could no longer serve as a substitute for the scalpel of arrest—and the officers did what their judgment, their training, their experience and their obligation required them to do.[20] It was the recognized and felt necessities of the time which impelled, and in my opinion, justified the action which was taken.

I am confronted with the findings of a jury on questions of fact and the studied rulings of a learned, careful and experienced trial judge in this case. I feel the end result of the trial court is a mistake and

18. *Id.,* May 5, 1971, § A at 1, col. 8.

19. *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 488, 41 S.Ct. 172, 184, 65 L.Ed. 349 (1920) (Brandeis, J., dissenting).

20. As Chief Justice Burger noted in *Scheuer,* the underlying rationale of official immunity is the sense of the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligation of his position, to exercise discretion, and the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good. 416 U.S. at 240, 94 S.Ct. 1683. If a police officer is to be held accountable for millions of dollars in damages for carrying out the duties of his office his willingness to execute those duties with the decisiveness required by the public good will be greatly deterred if not utterly destroyed.

a delusion. The opinion for the court enshrines this miscarriage by its self-justifying treatment of adroit intellectual symmetry—a sort of legal scholasticism.[21] My position is not in well-plowed fields, but I feel the shocking legal error in this case was the failure at trial and appellate levels to take judicial notice of the unfortunate acts of violence which preceded the events involved in the present case.[22] Had this legitimate and time-approved legal principle been properly presented at trial level and been properly established by admissible evidence, the police conduct, now held illegal, would have been portrayed in its true light and the immunity from civil damages of the police officials established as a matter of law. The results approved by the majority opinions display a complete blindness to reality. A verdict for the appellants would not shock the conscience of the nation, contribute to the abridgement of constitutional rights or destroy the fabric of society.

I respectfully dissent.

## APPENDIX

| Date Story Appeared in Post | Page | Headline, Story |
|---|---|---|
| April 21 | A-1 col. 5 | VETS CAMP ON MALL BANNED BY BURGER |
| April 22 | A-1 col. 1 | VETS DISOBEY COURT ORDER, SLEEP ON MALL |
| | A-15 col. 1 | WEARY VETS QUIETLY AWAIT POLICE MOVE |
| | B-1 col. 1 | PROTESTORS THREATEN MASSIVE CITY TIE-UP. . . |

Massive civil disobedience designed to halt functioning of government here. . . Protesters feel they must now resort to extra-legal tactics. . .

Leaders distribute Mayday Manual. . . Protest leaders envision massive traffic jams, expect 50,000

| Date | Page | Headline, Story |
|---|---|---|
| April 23 | A-1 col. 7 | JUDGE LIFTS BAN ON VETS |
| | A-6 col. 7 | POLICE MOVE QUICKLY, GENTLY IN ARRESTING PROTESTING VETS |
| | A-23 col. 7 | Marquis Childs, VETERANS CAMP: WHAT THEY SEEK |

This capital never looked more beautiful in perfect spring weather nor was it ever more troubled, confused and torn by the divisions—that wrack the country. Between the DAR . . . the Vietnam Veterans against the War and . . . masses of tourists, it is enough to send the police right up the wall.

\* \* \*

. . . The danger is always present that violence will break out. It is a much greater danger in the upcoming mass demonstrations.

| Date | Page | Headline, Story |
|---|---|---|
| April 23 | B-1 col. 1 | WHO, WHAT, WHEN, WHERE, WHY AND HOW TO (AND NOT TO) . . . |
| | | KEEP HEALTHY, KEEP OUT OF JAIL, KEEP FROM DRIVING INTO IT ALL |
| | B-1 | HOW TO KEEP OUT OF JAIL |

If you see a cop with a megaphone, no matter if you can't hear what he's saying or if he's saying anything at all, walk as fast as you can away from there. He's warning the crowd to disperse, and its no defense to say he didn't tell you personally. Leave.

| Date | Page | Headline, Story |
|---|---|---|
| April 24 | A-1 col. 7 | VETS LEAVE; MASS MARCH SLATED TODAY |
| | col. 5 | WAR PROTESTS 1965-1971 |
| | A-8 col. 1 | Police have handled 289 demonstrations in the last year. |
| April 25 | A-1 col. 1 | END WAR NOW, THRONG DEMANDS OVER 175,000 RALLY AT CAPITOL |
| | A-16 col. 1 | STARTING MONDAY, PROTESTERS' AIMS TURN TO DISRUPTION |

\* \* \*

The planned actions signal a new order of militancy in the antiwar movement. Never before have antiwar leaders urged mass violations of the law and disruption of government functions.

| Date | Page | Headline, Story |
|---|---|---|
| April 26 | A-1 col. 5 | PROTESTERS SHUT N.J. TURNPIKE 10 DAY PROTEST TO BEGIN, GOVERNMENT DISRUPTION SCHEDULED |
| | A-16 col. 1 | Lobbying, Sit-ins to Mark Protests |

21. The reliance on *Nicholson* by the court's opinion is unique in that federal appellate courts usually look upward for guidance rather than to an unpublished opinion of an inferior court. Is this not an obvious means of attempting to move philosophically where it is impossible to arrive legally?

22. Although the Chief Justice concluded in *Scheuer* that it was inappropriate for the court there to take judicial notice of the "mob rule" conditions in existence, such a procedure is by no means foreclosed. 416 U.S. at 249–50, 94 S.Ct. 1683. The Court ruled that since there was no opportunity afforded petitioners to contest the facts assumed, and since there was no evidence before the court from which a finding of good faith could properly be made, it was improper for such a conclusion to be judicially noticed. *Id.*

However, in *Washington Mobilization Committee v. Cullinane,* 184 U.S.App.D.C. at —— ——, 566 F.2d at 114–115, No. 75–2010 (D.C. Cir. April 12, 1977), this court noted with approval that the district court had taken judicial notice of the facts recited in our opinions concerning the May Day 1971 demonstrations, i. e. *Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83 (1974); and *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 478 F.2d 938, *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973). The district court should have done likewise in this case.

| Date | Page | Headline, Story |
|------|------|-----------------|
| April 27 | A-1 col. 1 | D.C. GUARD TO TRAIN; PROTESTS DISRUPT HILL |
| | A-11 col. 1 | DEMONSTRATORS CAMP OUT, FREAK OUT IN THE PARK |
| April 28 | A-1 col. 3 | CHURCHMEN ASK NATION TO RE-PENT WAR |
| April 29 | A-1 col. 7 | GIRL ARRESTED AS WITNESS IN CAPITOL BLAST— |
| | col. 2 | 200 ARRESTED, BOND RAISED FOR PROTESTORS |
| April 30 | A-1 col. 1 | ARRESTS HALT WAR MARCH |
| | | 224 SEIZED AFTER RAZING WALL AT HEW |
| | col. 6 | PRESIDENT SAYS PROTESTS WON'T INTIMIDATE HIM |
| May 1 | A-1 col. 7 | KIDNAP PLOT DETAILS BARED; MORE INDICTED |

A federal grand jury issued a new indictment yesterday in the alleged conspiracy to kidnap Henry Kissinger and bomb government buildings.

| | A-1 col. 2 | 370 SEIZED BLOCKING DOORS AT JUSTICE |
| | A-1 col. 3 | 7,300 POLICE GUARDSMEN, READIED TO COUNTER DISRUPTION NEXT WEEK |
| | A-5 col. 1 | Judges Set Night Duty to Set Bond |
| May 2 | A-1 col. 7 | TROOPS MOVE IN TO AREA VISITORS MASS TO TIE-UP CITY; 50,000 IN PARK |

\* \* \*

Several thousand federal troops were readied for possible trouble in the next *three* days as the city's third consecutive week of antiwar activities began yesterday. . . .

| May 2 | A-1 | The Pentagon announced that army, air force and marine corps troops were ready. . . . |
| | A-1 col. 4 | Portrait of a Washington War Protest SPIRIT OF MILITANCY RISES |
| | A-16 col. 5 | NUMBERS TO CALL FOR TRAFFIC DATA |
| | B-6 col.1 | Lead Editorial MONDAY, MAY 3; SOME OBLIGATIONS |

It seems almost unnecessary to say that the army of anti-war demonstrators who hope to paralyze Washington, tomorrow cannot be permitted to succeed. . . . For *this, presumably we will have police and troops at hand,* men who in the past have demonstrated a high degree of sense and restraint in coping with disorderly protest . . . There has been enormous pressure on the police and officialdom over the past week, but we remain hopeful and confident that they will deal with the planned disturbance and disturbers in a firm, but disciplined and orderly way.

| May 3 | A-1 col. 6 | CAMPERS OUSTED, STILL PLANNING TO SNARL CITY TODAY |
| | | DAWN SWEEP CLEANS PARKS OF 45,000 |
| | A-1 col. 7 | JUSTICE CALLED SHOT ON CLOSING CAMP |
| May 4 | A-1 col. 7 | 7,000 ARRESTED DISRUPTING CITY NEW OBSTRUCTIONS THREATEN-ED TODAY |

| Date | Page | Headline, Story |
|------|------|-----------------|
| May 4 | col. 3 | ARRESTS SET U.S. RECORD FOR A SINGLE DAY |
| | col. 5 | PROTESTERS IRK CITIZENS |
| May 4 | A-1 col. 5 | JAILS, COURTS OVERBURDENED |

More than 7,000 persons were arrested in widespread hit-and-run skirmishes with police and federal troops in Washington yesterday as anti-war protesters made an unprecedented attempt to bring the government to a physical halt.

\* \* \*

Just before the dissidents took to the streets a message from President Nixon asking that Washington be kept "an Open City" was read over the police radio network at 5:00 a.m.

\* \* \*

Keeping the city open took 4,000 troops deployed and 4,000 in reserve, 1,400 D.C. National Guardsmen, the bulk of the 5,100 man D.C. police force and Park and Capitol police.

\* \* \*

Yesterday's picture of the city looked like this:

an estimated 11,000 to 12,000 demonstrators swarming through much of downtown Washington in the early morning blocking streets and tangling with police.

| | A-13 col. 1 | COMMUNICATIONS, LUCK KEEP FORCES ONE UP ON PROTESTORS |
| | A-16 col. 1 | Lead Editorial THE MOVEMENT, THE MEDIUM AND THE MESSAGE |

\* \* \*

But you cannot be much swayed by a movement when its message is obliterated by its medium—the smashing of cars, the blocking of streets, the scattering of garbage, the invitation to violence, the battling with police. That is the tragedy of the ongoing upheaval in the Capital, it is not so much a protest as a rampage and the message is not just lost; it is violated so that the movement is the loser in the end.

\* \* \*

The only possibility would seem to be that it will all get uglier, as patience wears thin on the part of the weary and hardpressed police and on the part of private citizens. With some exceptions forebearance was the word yesterday, for which all of us, and not the least of all the main body of the demonstrators, owe some debt to the skill and discipline of the police and the security forces.

| May 5 | A-1 col. 8 | 2,700 MORE JAILED IN PROTESTS |
| | | SEIZED CROWN AT JUSTICE |
| | | CAPITOL RALLY SET TODAY BY REMNANTS |
| | A-1 col. 7 | MASS ARRESTS DIRECTED BY JUSTICE DEPARTMENT |
| | A-1 col. 3 | SOME LEAVE DEJECTEDLY, OTHERS DIG IN |
| | A-16 col. 3 | CAPITAL WITNESSES SECOND DAY OF CIVIL DISOBEDIENCE... "TOMORROW WE INTEND TO BE BACK" |
| | A-24 col. 1 | Chief Wilson and his men are not to blame. With some exceptions, the Police Department as well as other area police forces and the military units all performed commendably given the job they had to do. There were some serious lapses, in which individual policemen used their clubs too readily and |

| Date | Page | Headline, Story |
|------|------|-----------------|
| May 5 | A-24 col. 1 | in which innocent bystanders, particularly if they happened to have long hair, were arrested without cause. But one could not look at the buses of policemen as they sped across town without having some sympathy for the strain and near exhaustion under which they have worked. The task Chief Wilson was given—to keep the city's traffic running at almost any cost—was a formidable one. And he has gotten no public backing from the man who assigned him the task, the President, who simply left town. |
| May 6 | A-1 col. 5 | 1,200 PROTESTERS ARRESTED AT CAPITOL |

Police arrested 1,161 singing, clapping and dancing antiwar demonstrators yesterday after the protesters forced the closing of the Capitol on the third day of their program of large scale disobedience.

 * * *

Protesters who crowded the east steps of the House of Representatives yesterday afternoon did not appear to be winding down their peace efforts.

| | A-1 col. 5 | Haynes Johnson, PROTESTERS POINT UP CONFLICT OF RIGHTS |

"It has long been a grave question whether any government, not too strong for the liberties of its citizens, can be strong enough to maintain its existence in great emergencies."

Abraham Lincoln

That old American dilemma has never been more clearly in focus than this spring week in Washington. The demonstrators have made their protests, the government has survived, but citizens everywhere are wrestling with disturbing questions in the latest aftermath of massive acts of civil disobedience.

| May 6 | A-1 | |

 * * *

The basic question involves probably the most delicate, complex, and central theme of American life-rights; the citizen's right to assemble peacefully and petition for redress of grievances, and the right to move freely without impairment. The rights of a majority—and a minority. The right to due process of law, and the right to be free from excessive bail or subject to cruel and unusual punishment. . . . All of these came in direct conflict this week in the streets and prison compounds and courtrooms of Washington. They have left Washington a troubled city.

 * * *

| | A-14 col. 1 | Capitol Police Chief James M. Powell announced over a bullhorn that the demonstrators would be arrested in ten minutes if they remained on the steps. His announcement was drowned out by the noise of the demonstrators. |

 * * *

The mass arrests on the Capitol Steps came with the approval of House Speaker Carl Albert. Albert told reporters that he had been informed by Powell that the demonstrators should be removed from the steps, and he said he answered "OK".

| | A-19 col. 7 | William Raspberry, MIXED EMOTIONS ABOUT MAY DAY |

 * * *

I am afraid, too, what might result if it were demonstrated that massive and ugly disruptions could result in major policy changes.

| Date | Page | Headline, Story |
|------|------|-----------------|

If government decisions come to be made that way, we might wake up to discover that apartheid has become official American policy.

Or genocide.

| May 10 | C-1 col. 5 | D.C. POLICEMEN GET SOME SLEEP AS DAY IS LARGELY PROTESTLESS |

After nineteen straight days of handling demonstrations, policemen here slept late yesterday morning . . .